NATIONAL FIBRE BOARD COMPANY

*vs.*

THE LEWISTON & AUBURN ELECTRIC LIGHT COMPANY.

Androscoggin.    Opinion June 26, 1901.

*Waters.    Dams.    Flowage.    Damages.    R. S., c. 92.*

1. Under the mill act (R. S., ch. 92) and subject to its provisions, the owner of a mill and dam can at any time appropriate, for raising and maintaining a head of water for working his mill, so much of the space in the river valley as has not already been appropriated by some other mill owner for his own mill.

2. Such an apppopriation, however, cannot be made effectual by mere proclamation, nor by merely marking limits, nor by mere casual, intermittent and irregular flowage. It must be by an actual occupation of the space by a head or pond of water raised by dams and their appliances, actually constructed or fitted, of the requisite height and efficiency to raise such head.

3. Such occupation need not be of uniform height throughout the year, but may vary with the seasons and the amount of flow in the river. So the movable

parts of the dam, such as flashboards, gates, etc., may be alternately set in place or removed to meet the variations in the flow of the river, without losing the right to the space acquired for flowage.

4. Movable flashboards placed on top of the dam to preserve the head of water in the seasons of low water, and removed to keep down the head of water in seasons of high water, become part of the dam and effectual to rightfully appropriate space in the river valley for flowage.

5. The use of such flashboards, however, to operate as a part of the dam and effectual to made such rightful appropriation of flowage space, must be of definite height and be set in place and removed with approximate regularity so as to preserve the uniformity of the head of water, rather than occasionally increase or diminish it.

6. Whatever has been the height and the regular use of flashboards upon a dam before the erection of a mill on the river above, the height cannot be increased, nor the time of their use be lengthened after the erection of such upper mill, to its injury.

7. In this case, the flashboards put upon the lower mill after the erection of the upper mill were of greater height, and kept on for a longer time than before the erection of the upper mill, and so increased the flowage as to injure the upper mill, by lessening its efficiency.

8. In estimating the damages suffered by the owner of the upper mill from lessening its efficiency by the unlawful increased flowage from below, there should be included the loss of the profits he was reasonably certain to have made but for the decrease in the efficiency of his mill caused by the unlawful flowage,—but speculative profits cannot be included.

9. In this case, the owner of the upper mill had built up an established manufacturing business in connection with the mill and the plant, which business at the time of the injury appeared to be regular and permanent, with a fair and regular demand for the product at prices affording a definite profit. Such profits were not speculative but, so far as appears, were reasonably certain to have been earned but for unlawful flowage, and hence should be included in the damages awarded.

10. So much of the interruption of the operation of the plaintiffs' mill as was caused by the lawful height or use of flashboards, or by other causes than the unlawful extra use of the flashboards, cannot be considered in awarding damages. The damages must be limited to those shown to have resulted exclusively from so much of the height and use of the flashboards as are shown to have been unlawful.

On report. Judgment for plaintiff.

Action on the case to recover of the defendant the damages for flowage of the plaintiff's wheels and machinery, in its mill at Minot Corner, by flashboards, 24 inches high, erected upon and across the

defendant's dam, located about five miles below the plaintiff's mill, on the Little Androscoggin River, in Auburn. The flowage complained of occurred between July 10, 1898, and the date of the writ, March 14, 1899.

The case is stated in the opinion.

*J. A. Morrill*, for plaintiff.

*H. W. Oakes, J. A. Pulsifer and F. E. Ludden*, for defendant.

SITTING: WISWELL, C. J., EMERY, WHITEHOUSE, STROUT, FOGLER, POWERS, JJ.

EMERY, J. In the latter part of January, 1895, the plaintiff corporation began the erection of a water mill upon its own land and across a non-navigable stream, the Little Androscoggin River, at Minot Corner. At that time, some three miles down the river, there were in existence another water mill and dam across the same river, which had been built in 1888, and were, in January, 1895, and thereafter, leased and operated by the defendant corporation. The plaintiff admits that the defendant thus had the prior and superior right to use the flow and fall of the river to the extent that the solid part of the lower dam in good repair would flow, and it claims that it set the wheels of its own mill above that flow. The plaintiff's mill was finished and put in regular operation in July, 1895.

Some three years afterward, in July, 1898, the defendant put on top of the solid part of its dam along its whole length, flashboards twenty-four inches high and maintained them there up to the date of the writ, March 14, 1899, to increase its head of water. The plaintiff complains that these flashboards have caused the water to flow beyond its former flow, and upon the plaintiff's wheels, and have thereby materially lessened their efficiency. This action on the case is brought to recover damages for this increased flow caused by the flashboards, the plaintiff claiming that such increased flow is beyond the defendant's right.

The first question raised is purely one of fact, viz: Whether the flashboards, added to the height of the dam, did set back the water upon the plaintiff's wheels and materially lessen their

efficiency. That water did flow up on the plaintiff's wheels is not denied, but the defendant claims such flowage was not shown to be caused by the flashboards. There was much evidence and argument upon this question, but it is enough for us to say that, after careful consideration, we are satisfied that the plaintiff's contention is so far sustained. We should not incumber the reports with reasons for decisions of questions of fact. Such reasons are of no service in the exposition of legal principles.

The next question raised is one of law as well as of fact, viz: Whether during the time named, from July, 1898 to March, 1899, the defendant had a legal right to maintain upon its dam flashboards twenty-four inches high flowing water, as they did, back upon the plaintiff's wheels.

At common law no person could maintain a dam, even upon his own land, and thereby flow water back upon the lands of riparian owners above. By our Mill Act, R. S., ch. 92, any person may build upon his own land across a non-navigable stream a water-mill and dams to raise a head of water for working it, and may thereby flow back the water of the stream upon the lands above as high and as far as he deems necessary for the profitable working of his mill, subject only to the conditions and restrictions named in the act itself. The land owners must submit to the flowage, and content themselves with the pecuniary compensation to be obtained through proceedings provided by the statute. Such mill owner can also in the same way increase the height of his dam and the extent of the flowage from time to time as the exigencies of his business may seem to him to require, he making increased compensation for the increased flowage.

But there is one important and absolute exception to the above named statutory right to retard the natural flow of a stream. "No such dam shall be erected (or canal constructed) to the injury of any mill (or canal) lawfully existing on the same stream." Section 2, of Mill Act, R. S., ch. 92. It follows, as a corollary, that when a second mill has been built above the flowage of the first and older mill and dam, such flowage cannot be increased by raising the dam or by other appliances, so as to lessen the original

efficiency of the mill above. Whatever the greater age of his mill, the right of a mill owner to increase his head of water ceases when the flowage begins to injure the operation of a mill, however new, if already lawfully erected before the injurious flowage began. So long, however, as the additional flowage does not reach up so far as to injuriously affect some mill by that time lawfully erected, the right to increase the flowage is unlimited except as limited by the statute itself. This increase can be effected by raising the height of the solid dam, by the use of flashboards, or by other appliances. The owners of unoccupied water powers, or mill sites, must submit to have them flowed out and made useless, and must content themselves with the statutory compensation. When, however, a mill is once lawfully erected above him, the lower mill owner is then limited to such flowage as he had made or appropriated before the upper mill was built.

In other words, a mill owner can at any time appropriate for raising and maintaining a head of water for working his mill so much space in the river valley as has not already been appropriated by some other mill owner for his own mill. This appropriation, however, must be actual to become a right. It cannot be by mere proclamation, nor even by merely marking limits. There must be an actual occupation of the space by a head or pond of water raised by dams actually constructed of the requisite height and efficiency to raise such head.

But there is a great variation in the volume of water flowing in our main rivers at different seasons and times of the year, and even in different years. Sometimes the volume is large and much more than can be used for power. At other times it is much smaller, and almost without power. With an unchanging dam the head of water will be much higher and the flowage will reach much farther back in seasons of rain than in seasons of drought. The appropriation will be correspondingly much less during some months, than during other months. Should an upper riparian mill owner set his newer mill at the upper edge of the flowage as it is in time of drought, he would have no cause of complaint if flowed out in times of high water, the lower dam remaining the same. He could

only complain of the increase of the flowage power of the lower dam by artificial means.

The profitable working of water mills on our rivers requires a comparatively uniform head of water the year round;— less than that normally caused by the dam in times of freshet, and more than that normally raised by the dam in times of drought. Mill owners accordingly seek to obtain an approximation to uniformity in various ways;— sometimes by building the solid dam sufficiently high to raise enough head in times of drought and providing sluice gates and waste gates to be removed to let the floods through in times of freshet;—sometimes by building the solid dam less high so as to let the floods pass over when they come, and by supplementing the dam in dry times by flashboards, placed upon the top to be removed when the drought is over. This latter practice is as lawful as the former, and by it the head of water and the appropriation of space above for flowage can be continued through the dry seasons and be made approximately uniform the year round.

Movable gates and planks in the sluice ways and waste ways in a dam, regularly put in place at appropriate seasons, are practically a part of the dam, and flowage by means of them will be an effectual appropriation of the river. So flashboards on the top of a dam, regularly put in place at appropriate seasons become practically a part of the dam, and flowage by means of them will be equally an appropriation. But to effect such an appropriation, by movable planks or boards in or on the dam, the use of them must be with some uniformity and regularity, so that the riparian owner above can see that they are regular appurtenances of the dam. They should be of practically uniform width, and generally removed and replaced at uniform times or stages of water so that the amount of the appropriation of the river, both as to extent and time, can be ascertained by persons proposing to build other mills. No series of years of use is essential. Indeed, the appropriation can be made in one season, if made so definite as to size, and time and length of use, that the upper riparian owner above can see what space is actually appropriated and for what length of time. Again, an appropriation once made is not necessarily lost

by an occasional omission to use the boards, or by occasionally and temporarily reducing their size or the length of time of their use, any more than an omission to flow while repairing or rebuilding a dam will destroy the right. Still, the boards and their use, like the dam itself, must in general be visibly uniform, regular and definite. The hap hazard, the indefinite, will not suffice.

The foregoing legal propositions we think are fairly deducible from the language of the statute, and are supported by authority. *Blanchard* v. *Baker*, 8 Maine, 253 ; *Heath* v. *Williams*, 25 Maine, 209 ; *Wood* v. *Kelley*, 30 Maine, 57 ; *Pitman* v. *Poor*, 38 Maine, 237 ; *Lincoln* v. *Chadbourne*, 56 Maine, 197. ; *Dingley* v. *Gardiner*, 73 Maine, 63 ; *Graham* v. *Virgin*, 78 Maine, 338 ; *Cary* v. *Daniels*, 8 Met. 466 ; *Pierce* v. *Travers*, 97 Mass. 306 ; *Amoskeag Manf. Co.* v. *Worcester Co.*, 60 N. H. 522 ; *Harris* v. *Social Manf. Co.*, 8 R. I. 133 ; *Noyes* v. *Stillman*, 24 Conn. 14 ; *Marcly* v. *Shults*, 29 N. Y. 622 ; *Hall* v. *Augsbury*, 46 N. Y. 622.

In this case the plaintiff admits that all the flowage caused by the solid or immovable part of the defendant's dam is rightful. Its complaint is solely against that extra flowage, extra both in extent and duration, caused by the twenty-four inch flashboards placed on top of the dam in July, 1898, and kept there up to the date of the writ, March 14, 1899. The question, therefore, is whether before the spring of 1895, when the plaintiff's mill was built, the defendant or its predecessors in title to the lower dam had begun to use twenty-four inch flashboards upon the dam in such manner, under the principles above stated, as to effect an additional appropriation of the river to the increased extent and time named. This is a question of fact upon which the defendant has the burden of proof. *Noyes* v. *Stillman*, 24 Conn. 15.

Here, again, no analysis or discussion of the evidence should be given. Our findings only should be stated. Those findings made after due consideration are these :—The lower dam was built in 1888. From that time up to 1893, flashboards of widths varying from eight to fourteen inches, and very rarely up to eighteen inches, were annually put on the dam at some time during the season of low water, and were usually carried away down stream by

the fall freshets, sometimes in the first rains, and sometimes though rarely by the spring ice. It does not appear that they were put on at regular dates or at specific stages of the water. They were not taken off at all, but were left to the operation of the elements, new boards being used each time. The wishes or remonstrances of the farmers above were generally heeded, and the use of the flashboards postponed, or abridged, or even given up at times, to avoid their objections. In 1893, Mr. Gay, the then owner of the lower mill, desired to increase the head of water by making more use of flashboards and of wider ones. He explored the river above while no flashboards were upon the dam, to ascertain the extent of the flowage with the dam in that state. He then put flashboards twenty-four inches wide upon the dam, and again explored the river above to ascertain the extent of the flowage with such flashboards on. He also about this time purchased of one riparian owner, Mr. Frank, the right to flow his land to the full extent caused by the twenty-four inch flashboards, but does not appear to have made any other purchases of rights for the proposed increased flowage. Almost immediately after his return from the second exploration, he took off the upper part of the flashboards, reducing the width to fourteen inches. These remaining boards went off down stream with the fall rains. Owing to business difficulties the lower mill was not operated during the years 1894 and 1895 and no flashboards whatever were placed on the dam during any part of those years. The plaintiff's mill was erected, as already stated, in the Spring of 1895, when no flashboards had been on the dam since the fall of 1893.

Here we have only one instance of the use of flashboards twenty-four inches wide, and that for a very short time in the summer of 1893. Indeed, these flashboards seem to have been put on as an experiment to see how much they would increase the flowage, rather than as and for a positive appropriation of so much more head of water. The owner apparently met with objections and difficulties which convinced him of the inexpediency of carrying out his project, since if he actually made such appropriation he would be answerable in damages under the mill act, as was held in *Dingley* v. *Gardiner*,

73 Maine, 63. Instead of leaving on the flashboards of the increased width, he almost immediately reduced them to the former maximum width of fourteen inches. He practically forbore to make the desired and, perhaps, intended extra appropriation.

The defendant rests some argument on two circumstances,—(1) that Mr. Gay, the owner of the lower dam in 1893, then formed and proclaimed the intention to appropriate an extra head of water to the full extent of flashboards, twenty-four inches wide,—and (2) that the lessor of the defendant corporation expressly leased the right to raise the head of water to that extent in fact, though not in terms. As to the first, as already stated, the forming and proclaiming an intention to appropriate a head of water will not suffice. There must be an actual, consummated appropriation. As to the second, the describing in the lease the extent of the right of flowage, merely indicates the lessor's opinion as to the extent of that right. It is not evidence against the plaintiff of the actual extent.

We think it evident that under the law, as above stated, the defendant has not shown a right to maintain on its dam flashboards so wide as twenty-four inches during the months from July to March. The plaintiff is therefore entitled to judgment for some amount.

What damages the plaintiff is entitled to recover is the remaining question and one of some importance.

The only machinery in the plaintiff's mill at Minot Corner, the wheels of which were impeded by the flashboards above, was machinery for the generation of electricity which was transmitted by wires to another mill of the plaintiff, on the same river nearly a mile above. This latter mill was fitted for the manufacture of leather board and then contained the equivalent of seventeen engines, called beating engines, by which the stock was made into the board. The electric power transmitted from the mill at Minot was directly applied to these machines, except a small part used for lighting purposes. This power, thus transmitted from the mill at Minot Corner, was necessary to the efficient operation of the machinery of this mill, and, with the mill's own water power, was sufficient. During the time covered by the writ, from July to

March, the extra backwater flowed upon the wheels at Minot Corner by the defendant's flashboards, as already stated, reduced the power of those wheels to such an extent that the amount or force of the electricity generated, and transmitted to the leather board mill, was thereby sensibly diminished by several horse power,— enough to compel the shutting off three of the beating engines, or to reduce the efficiency of them all to that extent. So far as appears, had it not been for the defendant's flashboards the whole number of engines in the leather board mill could have been efficiently run on full time, twenty-three hours a day from July to March, with the aid of the electric power generated at the Minot Corner mill.

The plaintiff claims compensation for the loss of the net earnings of the three beating engines thus made idle, or on the equivalent loss of efficiency of the whole plant. The defendant contends that all injury to the operation of the leather board mill is too remote and separate from the defendant's acts to be an element of legal damage. We think not. The connection between the machinery in the leather board mill and the water wheels at Minot's Corner is as immediate and direct as if that machinery were placed directly over the wheels, and connected with them by short belts or shafts. It is immaterial how far distant the wheels are from the machines, provided the one propels the other. Power is transmitted from wheels to machinery at a distance as directly by electric currents through wires, as by belts, or shafts or other appliances. When water wheels propel electric generators and the electricity thus generated flows over wires and propels machines even at a distance, the water wheels directly propel the machines.

The defendant again contends that the net earnings or profits alleged to be lost are not recoverable because too uncertain and speculative, and that the plaintiff is limited to the decrease in the rental value of its mill at Minot's Corner. If such profits are uncertain or speculative, they cannot be included in the assessment of damages. When, however, one has erected or acquired a valuable plant with an established business connected therewith yielding regular profits, and his plant is impeded in its efficient opera-

ation by the tortious act of another so that his regular profits are thereby lessened, he cannot be made whole unless he is reimbursed for the lost earnings of his plant. His whole plant and his business combined may earn far more income under his management, than the mere market rental value of some part, or even all of the plant. His actual loss from the diminished efficiency of his plant and the consequent diminished product, may be far more than the decrease in the market rental value. He is justly entitled to the profits which his sagacity, skill and industry would bring him in the business if not interfered with. If he cannot recover from the wrong-doer this actual loss over and above the decrease in the rental value he suffers a wrong, to the great reproach of the law.

The law, however, is not open to that reproach. In *White* v. *Moseley*, 8 Pick. 356, the defendant tore away part of the plaintiff's dam upon which was a mill, thereby lessening the efficiency of the mill. The plaintiff claimed and recovered not only the cost of restoring the dam, but also for the loss of profits through the interruption of his business. In *French* v. *Connecticut River Lumber Co.*, 145 Mass. 261, the defendant wrongfully caused sand and logs to accumulate in the river in front of the plaintiff's hotel. The plaintiff claimed and recovered the expense of removing the obstructions, and also the loss suffered from the consequent diminution of the business and profits of his hotel. In *Schile* v. *Brokhaus*, 80 N. Y. 614, the defendant tore down a party wall, thereby exposing the plaintiff's shop to the weather. The plaintiff was not confined to loss of rental value of his shop, but recovered the loss of profits from diminution of his business there. In *Holden* v. *Lake Co.*, 53 N. H. 552, the defendant tortiously lessened the water power of the plaintiff's cotton mill, thereby diminishing the efficiency of his machinery. It was adjudged that the plaintiff could recover for the consequent diminution of the net earnings or profits of his mill. In *Simmons* v. *Brown*, 5 R. I. 299, the defendant, by raising his dam tortiously, caused the water to flow back upon the plaintiff's wheels in his cotton mill above. The defendant contended, there as here, that he was liable only

for a fair and reasonable rent of the water power of which the plaintiff was deprived.  The court held, however, that the plaintiff could recover for the loss of such profits as he might have made upon the goods he would have manufactured but for the defendant's act.  In *Allison* v. *Chandler*, 11 Mich. 542, the plaintiff was tortiously ejected and kept out of a store which he had leased of the defendant, and in which he was doing a watch and jewelry business.  The defendant contended, there as here, that he was liable only for the value of the plaintiff's lease of the store,— but it was held that he was liable for the whole injury to the plaintiff's business, including loss of profits for the interruption of his business during the time necessary to obtain a new store and resume business.  In *Terre Haute* v. *Hudnut*, 112 Ind. 542, the city tortiously caused water to flow in and upon Hudnut's premises, compelling repairs and a cessation of the business of his grist mill for sixty days.  The point was made that the city was only liable ˙for the cost of the repairs and the fair rent of the mill during the time.  The court thereupon went over the whole question, citing many cases, and held that Hudnut was entitled to recover the loss of the profits he would probably have made in his business had it not been interrupted.

We find no decisions of our own court in conflict with the above. In the cases in which a claim to recover for lost profits is denied, it will be found that the profits claimed were not reasonably certain to accrue, but were speculative, contingent or otherwise uncertain or merely probable.˙  On the other hand in *Rodick* v. *Hinckley*, 8 Maine, 274, it was˙held, against the contention of the defendant, that the proper rule of damages for the detention of a vessel was what it could have earned by being chartered for that time. ˙In *Bucknam* v. *Nash*, 12 Maine, 474, a mill owner was deprived of logs he had acquired to saw in his mill.  It was held he could recover the loss of the profit of sawing the logs in his mill, (i. e. the earnings of the mill) and also the profit he would have received from the rise in the market price of the logs.  In *Frye* v. *Maine Central R. R. Co.*, 67 Maine, 414, the ˙plaintiff had a contract with the defendant by which he was to have the exclusive right to carry the

defendant's passengers between the Dexter railroad station and Kineo for $2.50 each passenger thus carried on through-tickets. The defendant wrongfully terminated the contract, but contended that the damages were limited to the difference between the $2.50 and the actual cost of carrying a passenger. It appeared, however, that the plaintiff's stage line between Dexter and Greenville, established under the contract, brought him other profits from way passengers, express service, etc., but not enough to keep up the line after the defendant terminated its contract. It was held that these additional profits, being reasonably certain during the remainder of the contract term, were to be included in the damages. In *McPheters* v. *Moose River Log Driving Co.*, 78 Maine, 329, the defendant wrongfully delayed the plaintiff in his performance of a contract to drive logs for another party, so that the plaintiff was delayed in receiving his pay. It was held that the defendant was liable to to pay the increased cost of driving and also the loss of interest on the contract price, which interest, of course, was only the reasonably certain earnings or profit of the money during the delay.

Recurring now to the evidence in the case, we find that the plaintiff had acquired its plant and was doing a business in connection with it, viz:—the manufacture of leather boards. The business appears to have become established, regular and permanent. Its volume was such that the factory or mill was running on full time, twenty-three hours a day. There is no suggestion of any falling off in the demand for or price of the manufactured product. No breakage of machinery, no interruption of any kind, is shown except that caused by the flowage. The regular daily product of three beating engines, running for twenty-three hours each day, was one ton of manufactured leather board. There was a regular definite profit upon each ton manufactured. It seems reasonably certain that such production and consequent earnings or profits would have continued during the time covered by the writ. At least, no reason is shown for apprehending the contrary. So far, therefore, as the defendant crippled the engines, and reduced their profit-making power, it should itself make up that profit.

The application of the principle of recovery for lost profits is

much more difficult than the exposition of the principle itself. Numerous circumstances must be considered. The factory did not run every day. The defendant apparently had the right to maintain flashboards of some width during some part of the time. Much of the time also, the ice, the natural high stage of the water, and other obstructions, may have more or less flowed out the plaintiff's wheels. It was for the plaintiff to show us how much of the flowage in amount, time and injury resulted directly from the defendant's use of flashboards in excess of right. We wish as was suggested by the justice presiding at the trial, the amount of damages might be assessed by a commission of experts, who could obtain full data and make the proper discrimination between the rightful and wrongful flowage. The task, however, has been imposed upon us, and after careful consideration of the limited data laid before us, our minds rest upon the sum of eight hundred dollars as the most that is justified by the evidence in this case.

*Judgment for the plaintiff for eight hundred dollars.*