Coös,
April 6, 1909.

## McMILLAN & a. v. NOYES & a.

The statute (P. S., *c.* 142, *ss.* 12–19) providing for the acquisition of flowage rights by the exercise of the power of eminent domain and the assessment of damages caused thereby is constitutional.

One seeking to appropriate the riparian rights of another under the flowage act must show that his use of the power so acquired is a "public use," within the meaning of article 12, bill of rights; and whether a given use is public in character is a question of law.

The use of power for the generation of electricity, by a corporation chartered for the express purpose of furnishing electric lighting in several towns, is a public use, subject to legislative control and regulation, which justifies the exercise of the power of eminent domain in the acquisition of flowage rights; and the fact that the corporation may employ some of its power for private gain does not show that its use for general lighting purposes is not public in its nature.

The generation of electricity by machinery propelled by water-power is such

a manufacturing enterprise as the legislature intended to encourage by the enactment of the flowage act.

Where a corporation capable of acquiring flowage rights purchases a dam and mill, and voluntarily becomes defendant in an action to enjoin the grantor from maintaining the dam, its rights and liabilities are to be determined as of the date of its acquisition of title.

In such case an injunction against the corporation may be withheld, upon security for damages being furnished, until the questions involved in a petition under the flowage act can be determined and the damages assessed, unless it is clear that the latter proceeding is not maintainable.

Prior appropriation by beginning the construction of a dam cannot determine the right of flowage as between two riparian owners, unless it be made with a *bona fide* intention of developing and using the water-power for the propulsion of machinery; and the building by one owner of an unsubstantial and temporary structure which is incapable of developing power of any practical use, with the main purpose of preventing flowage by a lower proprietor, warrants a finding that the appropriation was illusory and not in good faith.

The fact that a riparian owner, having completed a dam which is incapable of developing power of practical use, forms a plan for building another and different structure, warrants a finding of abandonment of the original enterprise; and his declaration of intention to erect the new dam, unaccompanied by any act in furtherance of the purpose, does not constitute an appropriation of the water-power, as against a lower proprietor.

BILL IN EQUITY, for an injunction to prevent the defendants from maintaining a dam across the Androscoggin river which causes the water to flow back upon the plaintiffs' land. Transferred from the April term, 1907, of the superior court by *Pike*, J.

The plaintiffs are riparian owners of land in Shelburne on the Androscoggin river above Lead Mine bridge, at which place the defendant Noyes constructed the dam complained of. At the time of its construction he was the owner of land on both sides of the river at that point, having acquired his title September 1, 1905. The plaintiffs, believing that parties were desirous of building a dam at the bridge which would interfere with their rights above, on August 7, 1905, began the construction of a dam on their premises, which was to extend across the south channel of the river. In the main, their purpose was to thereby prevent the building of a dam below. Their real wishes were that no dam should be built, either below them or upon their land. They desired to preserve the natural beauty of their adjoining estate, which is quite extensive. They would not have attempted to build a dam upon their land unless they had believed it was nec-

essary in order to prevent others from building one at the bridge; but if one was to be built, they wished to build it and had a purpose so to do, believing that they could turn the power to some useful ends in and around their premises.

Before his purchase of the mill privilege at the bridge, Noyes had looked the property over and had some surveys made for the construction of a dam. He built a coffer-dam which was completed October 7. Thereupon the water began to rise in the river, and on October 9 the plaintiffs were obliged to discontinue work on their dam ·because of the depth of water thus set back. At that time their dam had nearly reached completion, but no wheel had been installed upon it and no power-house had been erected. It was hastily and rather imperfectly constructed, and, without some changes being made upon it, it would not develop a head of more than two and one half feet. Before they had completed their dam, they concluded to build a larger one extending across both branches of the river. They felt that to accomplish their main purpose it would be well to have a higher and larger dam— one that would in fact extend across the river. They believed that if they were to prevent the development of power at the bridge below they should enter upon this larger undertaking. They·felt, however, that they could make the undertaking a paying one, and were warranted in that belief; and it is probable that they would have constructed such a dam if they had not been prevented by the raising of the water by the dam below.

Noyes proceeded diligently with the work of building a dam at the bridge and finished it April 10, 1906. His purpose in erecting it and the power-house was to put in machinery for developing electricity and to sell or rent power to other parties for private gain. August 13, 1906, he conveyed his mill privilege and the adjoining land to the Berlin-Shelburne Power Company, which has since owned and operated the plant. The Power Company is a voluntary corporation under the laws of this state, and the articles of incorporation provide as follows: "The purposes for which the corporation is established shall be to acquire, improve, and develop one or more water privileges upon the Androscoggin river in the county of Coös in the state of New Hampshire or elsewhere, to acquire by purchase or to construct dams, mills, and power-houses, to generate electricity for light, heat, and power, to erect poles and stretch wires thereon for the transmission of electric current through the ·towns of Shelburne and Gorham and the city of Berlin in said county of Coös and other towns adjacent thereto and for the distribution thereof to all persons desiring to make use of the same, to send the electric current so generated, transmitted, and distributed for the purpose of furnishing light,

heat, and power, or for any other purposes to which it may be adapted, to engage in the business of electric lighting, to engage in the manufacture of lumber, wood-pulp, and other commodities, or any other lawful business permitted to said corporation by the laws of the state of New Hampshire, and to have and to exercise the powers conferred upon such corporation by chapter 142 of the Public Statutes of the state of New Hampshire and amendments thereof and all other powers and privileges conferred by the laws of said state."

The Power Company has voluntarily become a party defendant to this suit, which was begun against Noyes and others October 10, 1905. March 30, 1907, the company began proceedings under the flowage act for an assessment of the plaintiffs' damages caused by its dam. The court found that when the defendants' dam was completed the plaintiffs did not have a mill upon the river, or a mill upon a mill site or a mill privilege thereon which had been lawfully erected within the meaning of the flowage act, unless they had as a matter of law upon the facts reported; that an injunction should issue against the Power Company, and issue only provided the company has no right to maintain its petition for the assessment of damages for flowing the plaintiffs' land; and that there should be a decree against Noyes and his agents for damages suffered by the plaintiffs up to the date of the filing of this bill. The Power Company moved that the bill be dismissed as against it, and excepted to a denial of the motion.

*Alfred R. Evans, Drew, Jordan, Shurtleff & Morris*, and *Smith & Smith*, for the plaintiffs.

*Edmund Sullivan, Branch & Branch*, and *Anthoine & Talbot* (of Maine), for the defendants.

WALKER, J. The finding of the court at the trial upon all the evidence is that an injunction shall issue against the Berlin-Shelburne Power Company, which will be hereinafter referred to as the Power Company, provided it has no right to maintain its petition under the provisions of chapter 142, Public Statutes, known as the flowage act. That act provides that "any person or corporation authorized by its charter so to do may erect and maintain on his or its land, or upon land of another with his consent, a water-mill, and a dam to raise the water for working it, or for creating a reservoir of water, and for equalizing the flow of the same, to its use, and to the use of mills below, upon and across any stream not navigable, upon the terms and conditions, and subject to the regulations, hereinafter expressed." P. S., c. 142, s. 12.

Acquisition of flowage rights under and in accordance with the provisions of this statute has been decided to be in harmony with the constitution, or not to be repugnant to any of its terms, restrictions, or conditions, in so many cases where the point was elaborately discussed and considered, that the question of the constitutional validity of the legislation upon this subject cannot now be deemed an open one in this state; and a reëxamination of those cases, however interesting, would not be useful. See *Great Falls Mfg. Co.* v. *Fernald*, 47 N. H. 444; *Ash* v. *Cummings*, 50 N. H. 591; *Amoskeag Mfg. Co.* v. *Head*, 56 N. H. 386.

The Power Company, in order to maintain its petition, must bring itself within the terms of the statute reasonably construed in view of the legislative purpose and intent. It is conceded that one seeking to appropriate the riparian rights of another under the statute must show that the use of the power so acquired for the propulsion of "a water-mill" is a "public use" within the meaning of article 12, bill of rights, which provides that "no part of a man's property shall be taken from him or applied to public uses without his own consent or that of the representative body of the people." The Power Company assents to this proposition, which is the basis of the plaintiffs' argument upon this aspect of the case. The question is thus logically presented, whether the use which the Power Company makes of its water-power in connection with its mill or power-house is a public use, which it is authorized to exercise for the public advantage. This is a question of law. *Concord R. R.* v. *Greely*, 17 N. H. 47, 56; *Rockingham etc. Co.* v. *Hobbs*, 72 N. H. 531, 532.

By its charter or articles of incorporation, its purposes are declared to be "to acquire, improve, and develop one or more water privileges upon the Androscoggin River, . . . to acquire by purchase or to construct dams, mills, and power-houses, to generate electricity for light, heat, and power, to erect poles and stretch wires thereon for the transmission of electric current through the towns of Shelburne and Gorham and the city of Berlin in said county of Coös and other towns adjacent thereto and for the distribution thereof to all persons desiring to make use of the same, to vend the electric current so generated," and "to engage in the business of electric lighting." The furnishing of electricity for light and power, when exercised by a *quasi*-public corporation in accordance with the terms of its charter, may be a public use justifying the exercise of the power of eminent domain for the acquisition of the necessary rights and privileges in the real estate of individuals. In *Rockingham County Light & Power Co.* v. *Hobbs*, 72 N. H. 531, 535, it is said "that the use of land for collecting, storing, and distributing electricity, for the purposes

of supplying power and heat to all who may desire it, is a public use, similar in character to the use of land for collecting, storing, and distributing water for public needs—a use that is so manifestly public ' that it has been seldom questioned and never denied.' 1 Lew. Em. Dom., s. 173." And it was held in that case that a corporation, by invoking the power of eminent domain for the acquisition of rights in the land of others for the distribution of electricity, became in effect a public-service corporation, which can be compelled to afford reasonable service to the public at reasonable rates.

The logic of that case is peculiarly applicable to this. The Power Company, incorporated for the express purpose of furnishing electric lighting in several towns, which may be of great public utility, agrees and in effect becomes bound to afford the public reasonable electric lighting facilities through the power obtained in part by its flooding the plaintiffs' premises. The power thus conserved and distributed is devoted to an important public use which the company cannot ignore. If the legislature had specially authorized the Power Company to do what it has done at Lead Mine bridge, upon paying the damages occasioned thereby, in order to furnish power for lighting purposes in Berlin, the public use, which it is claimed is the only justification for the exercise of the power of eminent domain, would be no more apparent than it is in this case. Whoever desires the convenience of electric light in Berlin is, as a member of the public, entitled to the service by the Power Company, subject to such regulations in the successful conduct of the business as are reasonably necessary. The company cannot decline to perform its public duty. The use, therefore, which the company is obliged to make of its water-power is a public use, subject to legislative control and regulation. If an individual like Noyes could not acquire flowage rights for the purpose of generating electricity for sale because he is under no obligation to serve the public, and if in such a case the use could not be said to be public because it might be held to be independent of legislative control, it does not follow that the corporation—an artificial entity of limited powers—cannot acquire such rights, or that its use of the power would not be a public use. It is in fact a public agent exercising powers for the public advantage, which are subject to legislative control and enforcement. The fact that it may also use some of the power developed by its dam for purposes that are not public and for private gain does not show that its use for general lighting purposes is not a public use, justifying its acquisition of flowage rights. *Concord R. R.* v. *Greely,* 17 N. H. 47, 60.

But it is said that the Power Company does not bring itself

within the terms of the statute because it is not maintaining "a water-mill" in connection with its dam. That it has erected a building and installed the necessary machinery for the conversion of the water-power secured by its dam into electric power is conceded. The machinery is run by water-power, and in the ordinary use of language the establishment might be termed a water-mill; that is, a mill operated by water-power. That the mill in question falls within the literal meaning of the statute is evident. It is argued, however, that the legislative purpose was to encourage the establishment of manufactories operated by water-power, that a water-mill is a structure where some useful article or articles is manufactured by machinery driven by water-power, and that electric energy, though conserved for industrial purposes by the application of water-power to intricate machinery, is not a manufactured product. If it is admitted that the present flowage act was passed, as its title indicates, for the encouragement of manufactures (Laws 1868, *c.* 20), the question remains whether electricity accumulated for commercial use may not be deemed a manufactured product within the meaning of the statute. That electrical energy was not of much commercial importance forty years ago, and was not one of the mechanical products which the legislature then had in mind, is not conclusive evidence that it does not fall within the list of articles whose manufacture the legislature intended to encourage. *Bly* v. *Railway*, 67 N. H. 474. A holding that the legislature intended to limit its encouragement to mill-owners who manufactured such articles as were known and used previous to 1868 would plainly be an unreasonable construction of the act, not required by its language and not supported by the public policy upon which it was based.

The decision in *Williams* v. *Park*, 72 N. H. 305, is not, as argued, a conclusive authority that the Power Company's business is not a manufacturing industry of such a character as to be within the purpose of the statute in question. In that case it was held that a plant designed for generating and distributing electric light and power is not a "manufacturing establishment" within the meaning of the statute (P. S., *c.* 55, *s.* 11) which authorizes towns to "exempt from taxation for a term not exceeding ten years any manufacturing establishment proposed to be erected or put in operation therein." After an historical review of legislation upon the subject of tax exemption and in consequence thereof, the court say: "'Manufacturing,' then, in the present statute, is used in the sense of working materials into a fabric or structure for use, as, for example, cotton into cloth, iron into tools, wood into carriages, etc." The reasons which led the court to that result in that case are entirely absent

in this case. There has been no express legislative language defining or restricting the kind or character of work to be done in a mill by means of a "water-mill" under the statute in question. The legislature has furnished no verbal evidence that the word "manufactures," as used in the title of the act, is to be understood in a narrow or peculiar sense, rather than in a broad and general sense. The essential ground of the opinion in *Williams* v. *Park* is that, as it is not plain upon a consideration of legislation on the subject of tax exemption whether electrical plants are included in the class of property that towns may exempt from taxation, the resulting doubt determines the question against such exemption. But the question here is not whether there is such a doubt as to the meaning and extent of the statute as in that case and under that statute was held to have a restrictive effect; but whether upon a reasonable construction of the verbally unrestricted language used, in view of the general purposes of the act as applied to the present state of mechanical and scientific enterprises, the generation of electricity by machinery propelled by water-power is such a manufacturing enterprise as the legislature intended to encourage. A negative answer can only result by unreservedly adopting the so-called rule of strict construction and imputing to the legislature a purpose to restrict the operation of the act to ancient mills, like the old-fashioned gristmills and sawmills. But existing legislation of a general character, which is not specially restricted, must receive a construction based in part at least upon the present state of society, and not entirely upon the long discarded customs in vogue at the time of its original enactment. To say that the only mills covered by the statute are gristmills and sawmills, because anciently there were no other mills or manufactories, would be as absurd as to insist that a water-mill means a mill run by a primitive water-wheel. General legislation is intended to operate *in futuro* and ordinarily to apply to new conditions caused by the progress of industrial enterprise. *Concord R. R.* v. *Greely*, 17 N. H. 47, 58; End. Stat., *s.* 112.

The claim that the rights of the parties must be determined as of the date of the plaintiffs' bill cannot be sustained, in view of the special finding that no injunction is to issue if the Power Company can maintain its petition under the flowage act. The plaintiffs' bill was filed October 10, 1905; the Power Company was not made a party defendant, for it did not acquire its title until August 13, 1906. It now voluntarily becomes a party. It filed its petition in March, 1907, and the principal contention is as to its right at that date of maintaining such a proceeding. By its deed from Noyes, it acquired title to the land on both sides of the river, including the dam and mill which had then been com-

pleted, but not any right to flow the plaintiffs' land, because Noyes had acquired no such right. He did not convey to it property rights he did not own. If Noyes had damaged the plaintiffs' property by building the dam, it does not follow that his grantee is liable therefor. The company was not obliged to continue the trespass. It could have easily drawn off the water and avoided any liability for trespassing on the plaintiffs' land. Its rights and liabilities commenced when it took Noyes' title, and not before. *Fifield* v. *Bailey*, 55 N. H. 380; *Anderson* v. *Hubble*, 93 Ind. 570, 579; 2 Farn. Wat., ss. 566, 566a.

As the Power Company brings itself within the terms of the act so far as its legal standing is concerned, the question arises whether the plaintiffs have done anything which under the statute bars the company's *prima facie* right to insist upon an assessment of damages. Section 19 of the act provides that "the provisions of the seven preceding sections shall in no way affect any mill of other persons lawfully existing on the same stream, nor any mill site or mill privilege of other persons on which a milldam has been lawfully erected and used, nor the right of any owner of such mill, mill site, or mill privilege, unless the right to maintain on such last mentioned site or privilege shall have been lost or defeated by abandonment or otherwise." At the time the Power Company's proceedings for the acquisition of flowage rights were begun, did the plaintiffs have a "mill . . . lawfully existing on the same stream," or "any mill site or mill privilege . . . on which a milldam has been lawfully erected and used"? The finding of the court upon this subject is that they did not have such a mill or milldam, "unless they are held so to have had, as a matter of law, from the facts herein reported." The question thus presented is whether the finding is sustainable upon the evidentiary facts reported and the law applicable thereto. If there is any evidence which would authorize the finding, upon a correct view of the law governing the subject, it cannot be set aside.

If the terms of the statute are given a literal application to the facts, the plaintiffs did not have a mill upon their mill site. It does not appear that they have constructed a mill building or procured machinery for its equipment. They had nearly completed their dam when the set-back of the water caused by Noyes' dam compelled them to suspend work thereon. This occurred October 9, 1905, some ten months before the company bought the land at Lead Mine bridge. From that time until March 30, 1907, nearly a year and a half, it is not claimed that the plaintiffs made any progress in the work of completing their dam, or building a different one as they proposed, or in erecting a mill building. The plaintiffs' dam that existed when the company acquired its title

and when it filed its petition under the flowage act was, so far as it had been completed, hastily and imperfectly constructed, and was an unsubstantial structure which would develop a head of not more than two and one half feet. In that condition it could be of very little practical importance as a milldam. It is also significant that it does not appear what kind of a mill, if any, they proposed to erect, or for what purpose they intended to utilize their water-power. The mere building of a dam, with no purpose to use the power in running a mill, cannot be held to be such a use and appropriation of a water-privilege by a riparian owner as will prevent a lower riparian owner from causing the water to flow back for milling purposes. *Fitch* v. *Stevens*, 4 Met. 426. If the rule is adopted that prior appropriation by beginning the construction of a dam determines the right of flowage as between two riparian owners, it is important that the prior appropriation be made with a *bona fide* intention of developing and using the water-power for the propulsion of machinery. *Fibre Co.* v. *Company*, 95 Me. 318, 322; *Elting Woolen Co.* v. *Williams*, 36 Conn. 310, 318; *Miller* v. *Troost*, 14 Minn. 365, 370; *Nosser* v. *Seeley*, 10 Neb. 460, 468; 2 Lew. Em. Dom., s. 305; Wash. Ease. (4th ed.) 469. The language of the statute precludes the idea that one may defeat the appropriation of his water-rights by another by merely building an unsubstantial and temporary dam which is incapable of developing power of any practical use. The building of such a dam is evidence that its owner is not in good faith proceeding to utilize his mill site for practical purposes. In other words, in the language of the statute the dam must be not only " erected " but " used," or at least intended to be presently used as a conservator of power for the operation of a mill. The building of a dam for some other purpose, as for the purpose of creating a fish pond, a swimming pool, or for hydraulic use (*Arimond* v. *Canal Co.*, 31 Wis. 316; *S. C.*, 35 Wis. 41), evidently would not be such a dam as falls within the protection of the statute. When in connection with this evidence of the want of a definite purpose to utilize the power, it appears that the main purpose of the plaintiffs was to prevent the building of a dam below, that they did not want the water-power on their land to be used at all, and that they would not have built a dam unless they had thought it was necessary in order to prevent the building of one below, a finding that what they did was illusory and not in good faith would not be illogical. " The encouragement of manufactures," the admitted purpose of the statute, shows that the public use and benefit was not to be defeated by subterfuge, and that illusory projects partially completed, devised as substitutes for the substantial utilization of a mill privilege, afford the owner no protection against the statu-

tory rights of flowage by other mill-owners. The inference from the facts is that if the defendants had abandoned the building of their dam, the plaintiffs would have ceased operations on their mill privilege. The water-power at that point would not have been utilized, and the statutory purpose would have been defeated.

Even if it is conceded that the plaintiffs were proceeding to develop their water-power by building a dam across one branch of the river, and had lawfully appropriated the right to do so, so that the owners of the mill privilege at the bridge were thereby precluded from proceeding under the statute to acquire flowage rights as against the plaintiffs, it appears that the plaintiffs had formed the plan of building another and different dam, because the one they had nearly completed was not deemed sufficient either to furnish any considerable power or to accomplish their main purpose, which was to prevent the development of the privilege at the bridge. This was at least sufficient evidence of an abandonment of their original purpose and of an intention to begin a new development. Moreover, it is evidence amounting almost to an admission that they did not regard the dam they were building of such a character as to size, structure, and availability as to afford them the protection the statute was intended to give a mill-owner. It could be found, therefore, that they lost their rights to maintain their dam by abandonment. Having abandoned this enterprise, they cannot successfully defend against the petition of the Power Company for the establishment of its flowage rights, by showing that they have an intention to build another dam. An intended milldam is not equivalent to one that "has been lawfully erected and used." Nor does it affect the legal situation that the plaintiffs were prevented from building a new dam by the raising of the water by the company's dam. When the company filed its petition in March, 1907, the plaintiffs did not have a milldam erected and in use. That they might have had one or intended to · have one is immaterial. The material inquiry is whether they in fact did have one, or were proceeding in good faith to complete one. As the evidence is sufficient to support the finding of the court upon this point, when the statute is given a broad rather than a literal construction, in accordance with the plaintiffs' contention, it is unnecessary to decide which rule of construction is legitimate. See *Baird* v. *Wells*, 22 Pick. 312. If the plaintiffs were not in good faith building their dam, intending to utilize the power thereby developed for milling purposes, although they began its construction before the dam below was begun, they cannot claim the protection of the statute, which was not intended to prevent the utilization of water-power for mechanical purposes:

and if, having nearly completed their dam, they found it was not what they wanted and abandoned it, intending or wishing to build another one at a different point on the river, their mere declaration to that effect, accompanied by no act, cannot upon the most liberal view of the statute amount to a practical appropriation of the water-power. The finding of the court upon this subject cannot be set aside.

The plaintiffs contend that there has been no trial of facts upon which the question of "public use" by the Berlin-Shelburne Power Company may depend. This appears to be so. The proceeding in which such facts would naturally be determined is a petition under the flowage act. The present proceeding is not such a petition, but is in effect a suit for damages for wrongful flowage. The Power Company is without right flowing the plaintiffs' property. Such flowing would now be enjoined if it were not for the fact that the right to do so may be acquired by an assessment of damages under the mill act and the payment of the sum assessed. Until the damages are assessed and paid, the Power Company can have no right to flow the land. If it were clear that a petition under that act could not be maintained, delay for its prosecution would be useless; while if such procedure might be attended with success, the granting of an injunction might do serious injury. It is therefore a reasonable exercise of discretion to withhold the injunction, upon security for damages being given, until the questions involved can be decided and the damages assessed, unless it is clear that the mill act is inapplicable. *Ash* v. *Cummings*, 50 N. H. 591, 620. The only decision intended on this branch of the case is that it cannot be said as matter of law that the Power Company's petition under the flowage act is unmaintainable in its own right or in the right of Noyes. The Power Company should be required, if the plaintiffs request it, to give bond for all damages occasioned the plaintiffs since its title accrued which may be recovered in a petition under the flowage act or otherwise. Upon the filing of such bond, the injunction will be withheld, provided the Power Company proceeds promptly with its petition. The final issuance or otherwise of the injunction will depend upon the result of such procedure.

This disposition of the case renders it practically unnecessary to consider whether an injunction might technically issue against Ward Brothers & Company, or, if it should, what the form of it should be. As damages have been assessed against them for their trespass upon the plaintiffs' land by unlawfully damming up the stream, the plaintiffs are entitled to judgment against them there-

for. *Ash* v. *Cummings,* 50 N. H. 591; *Roberts* v. *Company,* 73 N. H. 121; *Wright* v. *Company, ante,* 3.

*Exception sustained.*

YOUNG, J., dissented: the others concurred.