## LEE LINE STEAMERS, Inc., v. MEMPHIS, HELENA & ROSEDALE PACKET CO.

(Circuit Court of Appeals, Sixth Circuit. January 4, 1922.)

No. 3567.

1. **Monopolies ⟊16(3)—Pooling contract between steamboat companies, as common carriers, held a monopoly.**

Where two competing steamboat lines, common carriers, pooled their interests, agreeing to divide the earnings, and, if either carrier fail to make the allotted number of trips, such carrier should be charged on the

basis of average tons handled and the average price per ton received, etc., *held* to establish a complete monopoly in transportation in interstate commerce between given points.

2. **Monopolies ☞16(3)—Cannot be justified on the ground of benefit to the public, where in violation of the Sherman Act.**

Where two common carriers by steamboat between points in different states pooled their interests and divided the proceeds, such monopolies cannot be justified on the ground that it is in fact beneficent, for the good of the public and of itself, for justice of rates, maintenance of service, and elimination of rate wars, since such is in violation of the Sherman Act.

3. **Monopolies ☞21—Complaint by one steamboat line against another, based on pooling contract, held subject to demurrer.**

In an action by one steamboat line against another to recover money alleged due under a pooling contract, on which the complaint was based, *held*, that a demurrer to the complaint should be sustained, the contract being void and in violation of the Sherman Anti-Trust Law (Comp. St. § 8820 et seq.); the "rule of reason" being inapplicable to validate the agreement.

In Error to the District Court of the United States for the Western District of Tennessee; John W. Peck, Judge.

Suit by the Lee Line Steamers, Incorporated, against the Memphis, Helena & Rosedale Packet Company. Demurrer to complaint sustained, and complaint dismissed, and plaintiff brings error. Affirmed.

Lovick P. Miles, of Memphis, Tenn. (Wright, Miles, Waring & Walker, of Memphis, Tenn., on the brief), for plaintiff in error.

Chas. N. Burch, of Memphis, Tenn. (H. D. Minor and C. H. McKay, both of Memphis, Tenn., on the brief), for defendant in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

PER CURIAM. Plaintiff in error (called the Lee Line) and defendant in error (called the Adams Line) owned each a steamer engaged in public transportation on the Mississippi river between Memphis, Tenn., Helena, Ark., and Friar's Point, Miss. The two lines were thus engaged in interstate commerce. On September 1, 1919, they made an agreement, ending December 30, 1920 (with provision for extension for another year by mutual consent), for the division of the entire aggregate tonnage carried by the two lines, based on each steamer making two round trips each week—the earnings from the carriage of this aggregate tonnage to be settled for monthly on the basis of 50 per cent. for each line, after paying to the line carrying more than one-half the tonnage $1 per ton on such excess, as expense of handling the same. There was express provision that—

"If either carrier fails to make their allotted number of trips, then such carrier will be charged on a basis of the average tons handled, and the average price per ton received by such carrier, the same as if the actual number of schedule trips were made."

Provision was made for mutually selected landing keepers, or agents, at Helena and Friar's Point (whose salaries and expenses should be paid by the two lines in equal proportions); for the sale and conveyance

by the Lee Line to the Adams Line of a one-half interest in a lease acquired from the city of Helena, and for the sale and conveyance by the Adams Line to the Lee Line of a one-half interest in a certain warehouse, as well as for the enlarging or rebuilding of the warehouse at an equal charge to each of the two lines; for the furnishing by each line to the other of a printed record of tonnage handled each trip, showing the number of shipments, the weight of each, and the revenue received therefrom—these records to be "recorded" by a "mutually chosen" secretary and paid for by the lines in equal shares, and to be made the basis of the monthly settlements, and that "each party is to have access to all records for examination when requested by secretary." It is conceded that there were no other steamships engaged in the trade in question.

In July, 1920, the newly elected president of the Adams Line repudiated the agreement, on the ground that it was illegal. The Lee Line then instituted this suit for the recovery of a claimed balance of $11,-805.67 on account of tonnage handled, plus $28,000 damages by reason of defendant's repudiation of the contract. It appears from the complaint that neither party had before the agreement in question made more than two round trips per week; that the river lines were in competition with steam interstate railroads for the handling of passengers and freight between the points served by the steamer lines, the railroad routes being shorter than the river routes, and the former maintaining "daily steam railroad freight and passenger service, with which the boats of the complainant and defendant were in competition." The complaint was demurred to on the ground that the contract sued upon was illegal and void, both at common law and under the Sherman Anti-Trust Law (Comp. St. § 8820 et seq.), and also contrary to the laws of Tennessee, Arkansas, and Mississippi, as in restraint of trade. The demurrer was sustained, and (plaintiff declining to plead further) the complaint was dismissed. Judge Peck, who presided on the hearing in the District Court, filed the following opinion:

"The action is for money alleged to be due under a pooling contract between the two lines of steamers, and for damages for the repudiation of the contract during the continuance by the defendant. The defendant demurs to the declaration, on the ground that the contract on which the plaintiff sues is illegal and void, both at common law and under the Sherman Anti-Trust Law, and also contrary to the laws of the states of Tennessee, Mississippi and Arkansas, as in restraint of trade. The gist of the second clause of the contract pleaded against which the demurrer is directed, is that the companies agreed to divide their gross receipts equally, after allowing the one carrying freight in excess of its proportion $1 per ton as the expense of handling the same.

"The declaration alleges that each party had been for some years engaged in the operation of a steamboat on the Mississippi river between Memphis, Tenn., Helena, Ark., and Friar's Point, Miss., and that this transportation was in competition with railroads; but it is not alleged that it was in competition with other steamboats. It is further alleged that the purposes of the agreement were to eliminate duplication of expenses at common points; to establish and maintain only such just and reasonable rates for the handling of freight and passengers as the public should pay for the services rendered, and which would make it financially possible for the parties to operate their respective boats, for which there has been and is a reasonable

demand; to insure the continuation in service between the points named of at least two river steamers operating in 'free, open, and unrestrained competition, upon different schedules, instead of making probable, without said agreement, the elimination of one of said steamers, a monopoly of the trade by one of the parties hereto, and the reduction of otherwise available steamboat service to the extent of 50 per cent.'; and to prevent discrimination in rates and accommodations between patrons of the parties, and the avoidance of rebates and preferences to and among shippers. It is alleged that it was never the purpose of the contract, nor its effect, to prevent the entry into the trade of any other boat operated by another, 'nor have the parties hereto acting under said contract ever combined to fix rates, or take any other action for the purpose of deterring the entry of any other boat into said trade.'

"It is inferred, from those allegations aforesaid which aver that the elimination of one of the boats would result in a monopoly for the other and a reduction of the available service by one-half, that there were no other steamboats operating in the trade. The court is assured in this interpretation of the pleading by the candid statement of counsel for both parties during the argument that such was indeed the fact. The question, therefore, is whether two steamship lines so situated may lawfully make an agreement to pool and divide their receipts. The contention of the plaintiff is that, notwithstanding they were to pool their receipts, the companies were free to compete for business, and would compete, because the contract was only to endure for a year, and thereafter as might be mutually determined, and that it was to the interest of each company to maintain its separate good will in anticipation of the time when its receipts from operation would once more be unrestrictedly its own. Plaintiff further insists that, unless the contract unduly restrained or unduly interfered with the free movement of interstate commerce, and so became prejudicial to the public interest, it was not invalid; that free and unrestricted competition as to the passenger business remains, the contract touching only the freight tonnage; and that avoidance of calamitous rate wars is in the public interest, and not a restraint of trade.

[1] "The elimination of all incentive to compete as to rates is the obvious effect of this agreement for the pooling and division of freight receipts, by the only lines of steamboats plying between the points on their routes. It resulted in the fixing of rates for the carriage of freight in interstate commerce by the combination so formed. This combination had a monopoly of the freight traffic. Such a contract, so resulting, is, in and of itself, an undue restraint of trade and interference with the free movement of such commerce, and is prejudicial to the public interest. The substance and effect are to be regarded; the garb is immaterial. United States v. American Tobacco Co., 221 U. S. 181, 31 Sup. Ct. 632, 55 L. Ed. 663. This contract is not to be compared with one by which trade in merchandise is to some slight extent impeded. No genuine question can arise here as to whether the restriction was reasonable or unreasonable, because on the facts pleaded the monopoly was complete. The establishment of a complete monopoly in transportation in interstate commerce, between given points, certainly cannot be justified. 'The defendants were common carriers, and it was their duty to compete, not combine; their duty takes from them palliation, subjects them in a special sense to the policy of the law.' Thomsen v. Cayser, 243 U. S. 66, 85, 37 Sup. Ct. 353, 61 L. Ed. 597, Ann. Cas. 1917D, 322.

[2] "The other arguments advanced by the plaintiff to justify the monopoly on the ground that it is in fact beneficent; for the good of the public and of itself for justice of rates, maintenance of service and elimination of rate wars have been denied validity as against the Sherman Act by the Supreme Court. United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007; United States v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259; Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; United States v. Union Pacific Railroad Co., 226 U. S. 87, 33

Sup. Ct. 53, 57 L. Ed. 124; United States v. Reading Co., 226 U. S. 324, 33 Sup. Ct. 90, 57 L. Ed. 243; United States v. American Tobacco Co., supra. Similar questions were ruled adversely to plaintiff in United States v. L. S. & M. S. Ry. Co. (D. C.) 203 Fed. 295; United States v. Great Lakes Towing Co. (D. C.) 208 Fed. 733.

[3] "Giving full scope to the rule of reason laid down in Standard Oil Co. v. United States, supra, invoked by counsel for plaintiff, it is concluded, nevertheless, that the facts set forth in plaintiff's declaration disclose a contract the effect of which was a combination in restraint of trade and an endeavor to create a monopoly in interstate commerce, and therefore void.

"The demurrer must be sustained."

We not only think the judgment of the District Court right, and that it should be affirmed, but are content to adopt Judge Peck's opinion as a sufficient statement of the reasons for our affirmance, with this very slight elaboration:

As affecting the validity of the agreement in question, it is not important that way-landing traffic was not included within the restriction, and that the agreement would not necessarily run more than a year. Although a natural inference that the parties contemplated a continuing agreement to monopolize is raised not only by the express provision for renewal of agreement, but by the allegation of the complaint that contracts of the same nature had been in existence between these same parties since the year 1909, it is enough to demonstrate the invalidity of the agreement that during at least the year in question a complete monopoly of existing facilities for freight river traffic between the points named was effected, not only potentially, but actually and intentionally. That a complete unification of river freight transportation between the points stated was contemplated and effected plainly appears by the terms of the contract, in connection with the concessions before referred to, including the provision for equal division of combined gross earnings, which effectually discouraged competition between the two lines with respect to furnishing facilities or bettering service— a monopoly made even the more certain by requiring the line failing to make its allotted number of trips to account to the other line on the basis of the average tonnage which it would have handled, and at the average price per ton which it would have received, if it had made the full number of scheduled trips. Plainly, the rights of the public were set entirely to one side, and it was left to the mercies of the combination. Against this situation allegations of good motives and intentions are futile. The facts asserted in the complaint, if made the subject of proof, could not avail to validate the monopoly. The record leaves no room for the application of the so-called "rule of reason" as validating the agreement; nor is there anything to suggest that the arrangement in question was justified as a reasonable protection against destructive rate wars.

The judgment of the District Court is affirmed.