STATE, EX REL. O. S. SPILLMAN, ATTORNEY GENERAL, APPELLEE, V. INTERSTATE POWER COMPANY ET AL., APPELLANTS: NORTHERN NEBRASKA POWER COMPANY ET AL., APPELLEES.

FILED JULY 16, 1929. No. 26291.

*Hainer, Flansburg & Lee* and *H. E. Burkett*, for appellants.

*O. S. Spillman, Attorney General, T. J. McGuire, B. Ready* and *C. P. Craft, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY, THOMPSON and DAY, JJ.

EBERLY, J.

This is a suit in equity to enjoin the defendants from alleged combining and conspiring to and from unlawfully destroying the business of a competitor, and also from combining and conspiring to and actually monopolizing and restraining intrastate commerce in contravention of law and in violation of the public policy of this state. Plaintiff's petition reduced to its briefest terms had for one of its important and immediate purposes the enjoining of defendants named from putting into force a schedule of rates for electrical energy carrying a top rate of 6 cents per K. W. H. in the city of Hartington, Nebraska, which schedule, it was alleged, was adopted and maintained to further and effect the unlawful purposes above recited. In opposing this petition the defendants challenged its sufficiency as a matter of law, and the truth of its allegations as a matter of fact. In a trial to the court evidence offered in behalf of both parties to the litigation was voluminous. Upon consideration of the evidence adduced the trial court determined that as to the defendants, Interstate Power Com-

pany of Delaware, Interstate Power Company of Nebraska, Tri-State Utilities Company, Cedar Light & Power Company, the allegations contained in the petition were sufficient as a matter of law and true as a question of fact, and to this general finding added certain special findings consistent therewith, and, based thereon, entered an order enjoining the proposed schedule of rates, which will be hereafter referred to as the "6 cents per K. W. H. rate." From this order the defendants last named above prosecuted an appeal and the matter is before this court for a trial *de novo*.

We have made a careful examination of the record. Our conclusion is that the defendants, at the time of the institution of this action, were not engaging in, or proposing to engage in, merely a *bona fide* effort to meet competition, but that a fair preponderance of the evidence adduced in the case sustains the conclusion of the trial judge on this question of fact, who found to the contrary, and it must be conceded had the advantage of hearing and observing the many witnesses who appeared in person before him and testified in his presence.

There is little or no conflict in the evidence as to the essential nature and interrelations of the several defendants. They owe respectively their existence to the result of a definite plan and policy. This plan contemplated the Interstate Power Company of Delaware, a Delaware corporation, as a parent or controlling organization. Pursuant to this plan the properties and assets of the Minnesota Electric Distributing Company, the Tri-State Utilities Company, as well as those of other owners, were, in effect, merged in and consolidated with the Interstate Power Company of Delaware, so that at the time of the institution of this suit by the state in the district court, that company owned and controlled more than 42 million in assets situated in Iowa, Illinois, Wisconsin, Minnesota, North Dakota, South Dakota, Nebraska, and Oklahoma. The evidence obtained from defendant sources discloses that this plan, so far as amalgamation of properties of the Tri-State Util-

ities Company (including later the Hartington plant) was concerned, had been substantially effected, though possibly not formally completed, on or before May 1, 1926. The defendant Interstate Power Company of Nebraska, organized and existing under the laws of Delaware, was formed in 1927 to acquire and operate the properties formerly belonging to the Minnesota Electric Distributing Company and the Tri-State Utilities Company in Nebraska. The purchase price of the properties thus acquired and placed in the name of the Interstate Power Company of Nebraska was exclusively represented by all of the stock of the Interstate Power Company of Nebraska, none of which was disposed of to the public, but all of which passed to, and were, and are owned, held and controlled by the parent company, the Interstate Power Company of Delaware. It was the latter company that secured the cancelation and retirement of all of the "underlying securities" of the Tri-State Utilities Company and the Minnesota Electric Distributing Company, including all stocks and bonds issued by the last two organizations, and which organizations thereafter, so far as practical purposes were concerned, ceased to exist.

Horace H. Dodd, commercial manager of the Interstate Power Company of Delaware, as well as other affiliated entities, appearing as a witness in this case in behalf of the defendants, and in his testimony referring to that company and its subsidiary components, summarizes the existing situation in the following language: "The Interstate Power Company * * * owns and operates certain properties in its own name, it owns. Then it owns certain of these other companies, the reason being that in certain states it is more easy to comply with the local laws by having a separate company operating in the state. From an operating standpoint, as far as the operating organization goes, we consider it all one company." In substance, Mr. Dodd said: "We consider the Interstate Power Company of Delaware and the Interstate Power Company of Nebraska all as one company. In my capacity, as manager,

I circulate all over and conduct it and operate it in that way."

It further appears that the Interstate Power Company of Delaware is itself subsidiary to, and is owned and controlled in a manner quite similar by, the Utilities Power & Light Corporation of Chicago, which operates, owns and controls similar properties in some twelve different states.

The Cedar Light & Power Company is also a defendant, and in its name the business at Hartington, Nebraska, formerly operated by the Tri-State Utilities Company, the ostensible control of which was taken over by the Interstate Power Company of Nebraska, purports to be carried on. The Cedar Light & Power Company was organized after the Hartington Electric Light Company had been granted a franchise by the city of Hartington. It was known at that time there would be competition to be met at this point. It appears that the articles of incorporation of the Cedar Light & Power Company were drawn up and executed in the law office of Matthews & Koegel of Chicago, who are now and were then attorneys for the Utilities Power & Light Corporation of Chicago, the ultimate control, and are and were then attorneys for all subsidiaries thereto at that time, including the Interstate Power Company of Delaware and the Interstate Power Company of Nebraska. The incorporators executing these articles were Francis E. Matthews of the last-named firm of attorneys, J. N. Canavan, vice-president of the Utilities Power & Light Corporation of Chicago, also vice-president of the Interstate Power Company of Delaware, and also vice-president of the Interstate Power Company of Nebraska, and later president of the Cedar Light & Power Company. The third incorporator was J. W. Perkins "who works in the law office of Matthews & Koegel." The directors of this corporation were J. N. Canavan, J. W. Perkins, already mentioned, and C. C. Summers who was the managing officer of the business at Hartington under the Tri-State Utilities Company regime, as well as its successor, and F. E. Laramore. It appears that F. E. Laramore is

connected with the Utilities Power & Light Corporation of Chicago, though the exact nature of the relation does not definitely appear in the evidence before us.

The officers of the Cedar Light & Power Company were J. N. Canavan, president; C. C. Summers, vice-president; O. E. Koegel, vice-president; W. A. Horner, secretary of the Utilities Power & Light Company; J. L. Cross, auditor of the Utilities Power & Light Company; J. Neill Richards, assistant auditor of the Interstate Power Company of Delaware. In this connection it is to be noted that C. C. Summers was the person who had been in personal charge of the business at Hartington, and that O. E. Koegel, who appears as vice-president, was an attorney at law and attorney in the firm of Matthews & Koegel, already mentioned, and that J. N. Canavan was not only president but also the treasurer of the new corporation.

It fairly appears that not a dollar of money was ever paid in or any property whatsoever turned over to the Cedar Light & Power Company by any of the persons above named. It further appears from the evidence that this corporation purchased on Febuary 21, 1927, ostensibly from the Tri-State Utilities Company, "certain real property, electrical distribution system, and franchises pertaining to the same, situated in the city of Hartington, Cedar county, Nebraska, and paid therefor $65,000 by the execution and delivery of its promissory note dated February 21, 1927, for $65,000 due in thirty days."

The undisputed evidence is that the physical properties thus "purchased" were substantially all that the Cedar Light & Power Company owned or possessed; and that at this time did not exceed in value the sum of $25,000, reproduction value, less depreciation, being but $20,346; that, after "purchase" thus made, this corporation made immediately an application to the Nebraska railway commission for authority to issue a total of $65,000 in stock, with the express stipulation attached that this stock was not to be sold or disposed of to the public, but was to be delivered to and be the property of the Interstate Power

Company of Delaware. Subsequently, this application was amended so as to restrict the issue of stock to the sum of $25,000, but the announced plan was in no other manner changed.

It is admitted in the evidence on behalf of the defendants that the Cedar Light & Power Company is in fact, and was, from the time of its organization, as well as at the time of the trial in the district court, controlled and operated through, by and under the supervision of the officials of the Interstate Power Company of Delaware in promotion of the latter's policies and for the latter's benefits.

No other conclusion is possible than, in a business sense, the interest and even the actual controlling factors of the defendants, the Interstate Power Company of Delaware, the Interstate Power Company of Nebraska, and the Cedar Light & Power Company, are identical. Operatively, these corporations are controlled by unity of interest and of management. Considering the nature of the business transacted, as an entirety, and the manner it is carried on, as reflected by the record, these several related corporations appear to function as members of a single body dominated by, and for the exclusive advantage of, a single controlling will.

To summarize the events disclosed by the records before us that precede this litigation, it may be said that among the towns served by the Tri-State Utilities Company, hereafter referred to in Nebraska, was the city of Hartington, where this organization had acquired a franchise. There it owned and operated a distributing plant from which it furnished electrical current to its patrons. The charges exacted by it, as well as its predecessors, were governed by a prescribed "sliding scale." Under this scale the "top," which may fairly be taken as a basis of comparison with all sliding scales hereinafter referred to, was 18 cents per K. W. H. These charges the patrons at Hartington deemed excessive. After fruitless negotiations with agencies in immediate control and operation of their electric plant, and

with the representatives of the Interstate Power Company of Delaware, the parent and controlling organization, the city of Hartington, Nebraska, in an endeavor to secure relief from what was deemed exorbitant charges induced the promoters of the proposed Hartington Electric Light Company, doing business as the "Western States Public Utilities Company," to submit a proposition to furnish electrical energy to that city in the form of contract at the "top rate of 9 cents per K. W. H." This proposition, in turn, was by the mayor and council of that city submitted to the electors thereof and by them accepted at an election held for that purpose.

As a result of the agitation on this subject preceding the election, the rates were changed by the "control" of the Interstate Power Company before the granting of a franchise to the Hartington Electric Light Company from 18 cents per K. W. H. to a top rate of 14 cents per K. W. H.

The Hartington Electric Light Company, however, thereafter erected a plant, and prior to the commencement of this lawsuit actually engaged in the business of furnishing electric current to its customers, pursuant to a schedule of rates in which the top rate was 9 cents per K. W. H., and which was in accord with the written proposition which had been submitted to and accepted by the electors of the city of Hartington. Thereupon, the Cedar Light & Power Company was organized in the manner hereinbefore set out, and the defendants under the label of the Cedar Light & Power Company again attempted to reduce their rates to a sliding scale, the top rate of which was 6 cents per K. W. H.

At this point the state of Nebraska intervened by the institution of the present action. A careful perusal of the record in this case fairly discloses that it was the settled and controlling policy of the defendants, referring thereby to the control of the affiliated organizations already mentioned, to preserve the monopoly that it enjoyed at Hartington prior to the appearance of the Hartington Electric Light Company at all costs, and that all steps taken by them thereafter had this end in view.

In advancing this purpose it carried on an energetic campaign before the municipal electorate of Hartington in the newspapers and elsewhere to obtain a denial of the right of the Hartington Electric Light Company to enter this field. The circumstances surrounding the reduction of the rates from 18 cents to 14 cents per K. W. H. are such that it may well be inferred that this reduction was made to aid in securing the exclusion of all competitors from the Hartington field. These efforts were carried even to the extent of adopting a policy of intimidation, diplomatic, it is true, but no less effective, forcible and efficient in accomplishing the desired object.

Among the evidence sustaining these conclusions it may be noted that Mr. Horace H. Dodd, who in the transaction now referred to represented the "control" of all of the affiliated defendants and acting for and in their behalf, and whose authority in the premises is unquestioned in the record before us, in an admitted endeavor to prevent the Hartington Electric Light Company becoming a competitor in that city, called on Mr. Heber Hord, the head of the interests represented by the Hartington Electric Light Company, after the proposition made in its behalf had been approved and accepted by the electors of Hartington, but before the construction of the new plant had been commenced and before the old organization had lost a dollar's worth of business. Of the conversation which took place at the time, Mr. Dodd, a witness for defendants, on direct examination, says in part: "I called him (Mr. Hord) up and made an appointment and went down there (Central City, Nebraska) and Mr. Hord received me *very cordially*. I assured him I had come in a *friendly spirit*. * * * I showed him (Mr. Hord) a map of *our territory* (which, at the very least, covered parts of Nebraska, Iowa, Illinois, Wisconsin, Minnesota, North Dakota, South Dakota, and Oklahoma, and represented the situation and location of the clear assets aggregating forty-two million dollars), told him of our banking connections, and asked him to write to these banks and ascertain how we ranked in the utility business,

discussed the electric business in general, and Hartington in particular, *as to its* being a natural *monopoly*. I told him that we naturally felt that, having made this investment here in good faith, we were entitled to the business; that we expected to hold it, and put up as good a scrap as we could to hold it; that, if necessary, we would reduce the rates to whatever was necessary in order to hold the business."

Of course, in this evidence Horace H. Dodd is merely telling us, largely in the form of conclusions, the substance of his conversation with Mr. Hord. What the nature of the language was that he used, the force and effect which he employed, and the impression he created, and intended to create, may fairly be inferred from his own testimony, as he further says: "We visited perhaps for 45 minutes. Just as I left, Mr. Hord says: 'Well, I will tell you this much, *that I will not go into any of your other towns*. But, being at Hartington, they have gone so far there that I don't want to decide myself without talking to my associates'."

As a conclusion from the record, bearing in mind the sanctions of the Nebraska statute directed against those "engaged in the production, manufacture or distribution of any commodity in general use that shall intentionally, for the purpose of destroying the business of a competitor in any locality, discriminate between different sections, communities, or cities of this state by selling such commodity at a lower rate in one section, community or city, than is charged for said commodity by said party in another section, community or city, after making due allowance for the difference, if any, in the grade or quality and in the actual cost of transportation from the point of production, if a raw product, or from the point of manufacture, if a manufactured product," it is fairly established that the defendant organizations, each a separate corporate entity, were designed and intended by the "control," so far as effects produced were concerned, to secure the identical results which the public policy evidenced by the statute quoted

prohibited. For it appears without dispute that, of all thus exclusively owned and operated by an "identical control," one entity establishes a 6-cent rate at Hartington and the others give directions authorizing or maintaining elsewhere in Nebraska, under like situation, rates exceeding the Hartington rate by 100 per cent. In short, by multiplicity of corporate forms under a single "control" the commands of the statute were to be circumvented and the public policies established thereby were to be defeated. It fairly appears from the record as an entirety, what certain testimony establishes as an admission on the part of the agents of the "control" then engaged in the transaction of its business, that the "6-cent rate was a fighting rate," and "that the Cedar Light & Power Company was a fighting company" organized for that purpose "and to get around the damned Nebraska antidiscrimination statutes."

The first act of this new corporation, the Cedar Light & Power Company, after the business incident to its organization had been completed, was to secure the acceptance of its name in place of the name of its predecessor as subscriber to an advertisement then running in the local press of Hartington, which proclaimed to the local electorate the fact that there was to be established in Hartington a new sliding scale of electric rates with a 6-cent per K. W. H. "at the top." The intended effect of this move as plainly disclosed by what may be said to be the controlling evidence in the record, in view of the determination made by the district judge, was the absolute destruction of the Hartington Electric Light Company.

It is unquestionably true that the business of electric light and power generation and distribution, as now carried on, is one governed by the "economic law of increasing returns." In short, its very inherent nature invites monopoly. That fact is fully admitted by defendants' "control," and their witnesses frankly admit that the business they carry on, by its very inherent nature, is regarded as possessing the characteristics of a natural monopoly. There is no serious conflict in the evidence that the annual consumption

of electrical energy of all kinds at Hartington was, and is, approximately 600,000 K. W. H. Evidence in the record justifies the conclusion that on the basis of furnishing 100 per cent. of this amount at 9 cents per K. W. H., deducting for operating expenses and fixed charges at 6 per cent. and deducting for an annual depreciation of 5 per cent., which are the amounts as fixed by the plaintiff's experts, would show a profit of $8,535.52. The same amount of current furnished under the terms of a 6-cent top rate schedule, making similar deductions, would result in an unavoidable loss of $4,104 annually. It follows, in effect, that the difference to the consumers between the 6-cent rate and the 9-cent rate is $12,639.52 in favor of the 6-cent rate. True, under the terms of the 9-cent rate, on the basis of the contract with the Hartington Electric Light Company, $8,535.52 would be credited on the purchase price of the plant, as was stipulated by the contract and ordinance adopted pursuant thereto. But under the 6-cent rate upon the basis stated, it would not only be impossible to secure this credit or realize this profit, but there would be an unavoidable net loss of $4,104. However, the effect of the law of increasing returns is not to be forgotten. Under this, when that business is divided between two competitors, as the amount of business to each decreases, the loss suffered under the 6-cent rate would decidedly increase. This conclusion is more than borne out by the estimate furnished by the engineers of the "control" which appears in the record in the form of analysis of the proposition made by the Western States Public Utilities Company to Hartington, Nebraska, on the basis of the generation and distribution of 250,000 K. W. H. annually, and that discloses that there would be an annual deficit resulting of $15,630. Competent evidence also tends to establish that the cost to the "control" of generating the electrical energy for use at Hartington at the time of the institution of the state's action was, as near as could be ascertained, not less than 2.45 cents per K. W. H. wholesale, and in view of the division of business at that place, following the commencement of business by the Hart-

ington Electric Light Company, results in an actual loss to the Cedar Light & Power Company. In fact, there can be no question but what the 6-cent rate, with the business divided as it now exists in the city of Hartington, not only eliminates from consideration the provisions of the contract made by the city of Hartington relative to the acquirement by it of the plant erected by the Hartington Electric Light Company, but is inadequate and noncompensatory to such a degree as to render permanent competition on this basis wholly impossible and the ultimate destruction of the Hartington Electric Light Company unavoidable.

A careful consideration of this phase of the evidence in the record impresses the mind with the truth of the conclusion that the "control" who directed the installation of the 6-cent rate must be taken to have intended the natural consequences of their act. On this basis the conclusion is also inevitable that the Cedar Light & Power Company was dedicated when brought into being by those responsible for its existence to the work of the restoration and preservation of the monopoly which had previously existed at Hartington in the field of business in which it was destined to engage. This necessarily entailed the destruction of competition and ruination of its competitor. This conclusion is not only consistent with the measures it is actually sought to carry out but with the motive which its "control" undisputably expressed. There is no escape from the conclusion that what was done by it and its agents and the several corporate entities thus controlled in furtherance of its plan and purpose was done intentionally for the purpose of destroying the business of the Hartington Electric Light Company, in a manner inhibited by the terms of the Nebraska statutes and violative of the public policy of the state; that, so far as the question of fact is concerned, the conclusion upon which the decree of the district court in this case rests not only finds ample support in the record but is the conclusion which the record as an entirety necessitates this reviewing court to adopt.

We do not overlook the contention of defendants that

the establishment of the 6-cent per K. W. H. rate was insufficient to hold the patronage at Hartington, a result which, it is asserted, evidences the fact that this rate from a competitive standpoint is not too low. We cannot agree to this, for the period of time involved is too brief. As demonstrated elsewhere, the substantial difference between the 6-cent rate and the 9-cent rate is manifest. That the citizens of Hartington would continue for a substantial period of time to pay 9 cents when the same "product" or "commodity" was procurable at 6 cents is not in accord with the common experience of more than two centuries of competition. Besides, this temporary result evidently involves factors other than that now before the court for investigation.

Good business character and reputation are valuable elements in the good-will of any business. It is conceivable that the conduct of a business institution at a certain place, dealing in a certain commodity, might be characterized by such lack of "business morals" or "business morality," evidence such "depravity," in the commercial sense of that term, as to practically exclude it from securing customers irrespective of the values it may offer in the way of service of merchandise. Bad business character and bad business reputation are not ordinarily appealing elements to prospective customers, and certainly not to the conscience of a court of equity; at least, not to the extent that the results of the bad business character and bad business reputation and bad business standing may be made the basis of favorable consideration in tribunals administering equity.

However, in the instant case, the contention, it would seem, is fully answered by the fact that, as heretofore shown, the 6-cent per K. W. H. rate was, as a matter of fact, adopted with the express purpose of destroying the business of the Hartington Electric Light Company, and under it the defendants with this intent were selling electricity or electrical energy at a noncompensatory rate, and cheaper in that locality than was charged for the same to patrons elsewhere, who were similarly situated.

But this feature of the case is met by the defendants with the further contention that electricity or electrical energy as supplied by them, as well as their competitors at Hartington, is not a "commodity," nor "a raw product," nor "a manufactured product," nor is it a "thing in general use," nor "any article" or "product," as these terms are employed in the provisions of the laws of Nebraska on which the state relies in this case; that, in truth, and in fact, they are engaged in furnishing a "service" affected with a public interest, and are probably subject to the regulations of the Nebraska state railway commission only, and that the business thus carried on by them is not within the purview of sections 3432, 3448, 3449, 3453, Comp. St. 1922 of the state of Nebraska, nor are the principles of the common law upon which the state relies applicable to the situation. It must be conceded, however, that the Nebraska state railway commission is vested with no regulatory powers over rates for electricity in cities of the class to which Hartington belongs. It may be observed that, properly construed, "in general use" as used in section 3432, Comp. St. 1922, relates to the date of the offense, and not to the date of the passage of the act defining the same. Thus, radios were unknown in 1907, but it could hardly be contended now that dealers in radios are not strictly within the purview of the act. If we accept in part defendants' treatment of the terms "raw product" and "manufactured products" as mutually exclusive terms, but together embracing all to which the term "products" is applicable, we cannot agree with the definitions they propose, nor with the contention that the term "products" is inapplicable to electricity.

"Product" is defined by authoritative lexicographers as "a thing produced by nature or the natural processes; that which is produced by any action, operation or work; a production; the results; that which results from operation of a cause, consequence, or effect." So, too, the word "commodity" has been defined, "a thing of commodity; a thing of use or advantage to mankind; especially useful products;

material advantages, elements of wealth;" also "a kind of thing produced for use or sale; an article of commerce, an object of trade; especially goods, merchandise, wares, products; anything that one trades or deals in." Indeed, a distinguished economist has defined it: "A commodity is any portion of wealth." Thus, in the language of everyday life and in the strictly commercial sense of the term, "electricity" is "produced," "stored," "measured," "bought and sold." It is moved or transported from place to place in containers or by cable. It is something that one trades or deals in. We buy it and pay for it and determine the amount of our purchases by definite and well-understood "standard." Brought into being as a product, it exists in modern life as a commodity.

The conclusion is that, as a matter of strict definition, "electricity" in the commercial sense of the term is not only included within the literal terms of the statutes on which the state relies, but is plainly within the reason and spirit of the enactments, and that the principles of the common law are not without application to the situation before us. 20 C. J. 305; Curtis, Law of Electricity, p. 6, sec. 3; *Terrace Water Co. v. San Antonio Light & Power Co.*, 1 Cal. App. 511; *Seaton Mountain Co. v. Idaho Springs Investment Co.*, 49 Colo. 122; *People v. Wemple*, 129 N. Y. 543; *Beggs v. Edison Electric Illuminating Co.*, 96 Ala. 295; *Mill Creek Coal & Coke Co. v. Public Service Commission*, 84 W. Va. 662; *Scranton Electric Light & Heat Co.'s Appeal*, 122 Pa. St. 154; *San Antonio Gas Co. v. State*, 22 Tex. Civ. App. 118; *People v. Epstean*, 102 Misc. Rep. (N. Y.) 476; *Hetherington v. Camp Bird Mining, L. & P. Co.*, 70 Colo. 531.

Recurring again to the findings of fact heretofore made as to the interrelations of the defendant corporations, the purpose and object of their organization, the use of their respective corporate entities by their common control as devices by and through which the requirements of the laws of Nebraska applicable to the subject-matter in this action would be circumscribed and thwarted and the public policy established thereby be defeated, the reasoning and prin-

ciples announced by Rose, J., in *Enos v. Hanff*, 95 Neb. 184, appear applicable to the matters presented for determination, viz.:

"In a business sense the interests of the controlling factors in both corporations are identical. Where the financial interests * * * are thus united, the court, in furtherance of a public policy established by the legislature, will look beyond the legal entity of a corporation to the relations of the individuals behind it and enforce the law according to its terms."

See *United States v. Reading Co.*, 253 U. S. 26; *Lee Line Steamers v. Memphis H. & R. Packet Co.*, 277 Fed. 5; *United States v. United States Steel Corporation*, 251 U. S. 417; *United States v. Union P. R. Co.*, 226 U. S. 61; *Missouri v. Standard Oil Co.*, 218 Mo. 1, affirmed, *Standard Oil Co. v. Missouri*, 224 U. S. 270; *State v. National Cash Register Co.*, 13 Ohio Cir. Ct. Rep. (n. s.) 73; *Cooke v. People*, 231 Ill. 9; *Hunter v. Baker Motor Vehicle Co.*, 225 Fed. 1006; *Yazoo & M. V. R. Co. v. Searles*, 85 Miss. 520; *National Lead Co. v. Grote Paint Store Co.*, 80 Mo. App. 247; *Northern Securities Co. v. United States*, 193 U. S. 197; *Standard Oil Co. v. State*, 117 Tenn. 618; *McCaskill Co. v. United States*, 216 U. S. 504.

Upon reargument of this cause, certain questions were submitted by this court relative to whether sections 5, 6, and 7, art. XV, Constitution of Nebraska 1920, were self-executing and applicable to the situation presented in the instant case; whether the words of the Constitution, "use of the water of every natural stream within the state" and "use of the waters of the state for power purposes," in connection with the dedication thereof "to the people of the state," and also in connection with the limitation therein expressed that the same shall constitute "a public use," and "shall never be alienated," were effective to create a "public charity," and to embrace within their scope electrical current or electrical energy generated by use of such waters, and the legal effect of the dedication thus made. *Kirk v. State Board of Irrigation*, 90 Neb. 627; *Hudson County*

*Water Co. v. McCarter,* 209 U. S. 349; *West v. Kansas Natural Gas Co.,* 221 U. S. 229.

However, while the record discloses that undisputed evidence establishes that the "control of the defendants" through the agency of its constituent members has caused a series of written contracts and assignments thereof to be made relative to electricity generated by use of the Niobrara river water power commencing November 21, 1926, the first of which bearing that date being between the Northern Nebraska Power Company and the Interstate Power Company of Delaware, and the series ending with a contract in writing between the Interstate Power Company of Nebraska and the Cedar Light & Power Company, under date of February 24, 1927, by the terms of which the latter is to receive from the former at a substation maintained and operated by the Interstate Power Company of Nebraska at or near Hartington, Nebraska, electrical energy or electrical current generated by the hydro-electric plant of the Northern Nebraska Power Company at 1 cent per K. W. H., the record fails to disclose whether the date of the appropriation of the waters of the Niobrara, as required by statute, which must constitute the foundation rights of the Northern Nebraska Power Company, was made prior or subsequent to the adoption of the constitutional provisions referred to. We also find no evidence disclosing that transmission of electricity under the terms of the contract last referred to had actually been commenced at the date of the institution of this action by the state, or, in fact, at the time of the trial thereof in the district court.

It further appears, however, that the price per K. W. H. as fixed by the contracts between the Interstate Power Company of Delaware, the Interstate Power Company of Nebraska, and the Cedar Light & Power Company, due to their interrelation, would be without any controlling significance in determining the propriety of the rate of 6 cents per K. W. H. fixed by the Cedar Light & Power Company at Hartington, which is in controversy in this action. *United Fuel Gas Co. v. Railroad Commission,* 278 U. S. 300.

The questions suggested by the court as to the effect of the constitutional dedication referred to therein are therefore not decided but expressly reserved for future consideration of this tribunal.

In view of the principles of law heretofore discussed and the findings of fact as herein determined, it appears that the decree of the district court entered in this case is right, and its findings and orders made herein are in all things approved and affirmed.

AFFIRMED.

Goss, C. J., dissenting.

With regret I record myself as unable to assent to the views of the majority on some of the matters actually decided in the opinion. This is a suit in equity. Reduced to its briefest terms, it had for its purpose the enjoining of Cedar Light & Power Company from keeping in force in the city of Hartington a top rate of 6 cents per kilowatt hour for electric energy. It was alleged that the defendants conspired to practice unlawful discrimination in rates for the purpose of destroying the business of a competitor (Hartington Electric Light Company, a new company, recently granted a local franchise), in violation of section 3432, Comp. St. 1922; conspired to restrain trade and commerce in violation of section 3448; conspired to monopolize commerce in violation of section 3449; and conspired to market electric energy in Hartington at less than market value and at less price than in other towns in Nebraska, under like conditions, for the purpose of driving a competitor out of business, in violation of section 3453. The competitor, named above, had in effect a top rate of 9 cents. That rate was fixed by its franchise, but the franchise provides that all net earnings shall be set aside to provide a fund to pay for the cost of the plant and 6 per cent. interest thereon. When such items are paid the title to the plant and system is to pass to the city.

In 1908, section 3432 was held by this court to be constitutional, but the opinion stressed the legislative preservation of the rights of a defendant by saying that a violation

must be predicated upon proofs that it was "for the purpose of destroying the business of a competitor." *State v. Drayton*, 82 Neb. 254. Had the act failed to state the "purpose as an element of the offense" it would have infringed the Fourteenth amendment of the federal Constitution. *Fairmont Creamery Co. v. Minnesota*, 274 U. S. 1. So into the law must be read the individual right to meet competition.

But to my mind the proofs have utterly failed to show that a cause of action for injunction existed at the time the suit was commenced or at the time of the trial. There was no satisfying evidence that the 6-cent rate of the defendant was lower than the 9-cent rate of the competitor with the lure of municipal ownership thrown in to absorb the difference. The proof of the pudding is in the consumption thereof. The most practical test was shown by the evidence which indicated that, at the time of the trial, the bulk of the customers had left the old company and had gone to the new. At Bloomfield, another point where the same conditions existed, the new company had secured about 97 per cent. of the customers of the old company. These persuasive evidences and tests, rather than conclusions based on prophetic conjecture, should be taken as authoritative. They show that the new company had not been injured by the rate and that the injunction had no basis but prophecy. It cannot be truly said that a competitor has been stifled or driven out of business or injured by a competitive rate, when the evidence shows that competitor to be thriving on the competition. While other matters are argued in the opinion, this matter of the difference in rates is the crux of the opinion, as indicated by the second paragraph of the syllabus. That is what all parties, including the trial court, thought was the suit they were trying in the district court. I do not object to the first paragraph of the syllabus, to the effect that electric energy is a commodity and comes within the purview of section 3432.

The majority opinion in effect puts the old company out of business at Hartington. It leaves the field to the new.

.If the new company works out, as the majority seems to .think it will, then the consumers of electric energy at Hartington will be well served and at the same time their municipality will ultimately acquire the plant as a municipal asset. If it should fail to meet its advertised ends, they will .be in the hands of a single company. As a court of equity, I think we should provide against such a contingency rather than to aid it needlessly. My opinion is that we should have reversed the judgment of the district court because the evi- .dence did not warrant an injunction, and should have pro- vided that, if at any time the facts warranted it, our judg- ment should not prevent the state, or others injuriously affected by the rates, from bringing another suit on ac- count thereof. This would protect the consumers at Hartington and would protect the property rights of the defendants.

ROSE, J., dissents on the grounds stated by the Chief Justice.

Note—See Monopolies, 41 C. J. 128 n. 11, 203 n. 92; 52 A. L. R. 169.