8 So.2d 521

CURRY, Commissioner of Revenue, v.
ALABAMA POWER CO.

3 Div. 348.

Supreme Court of Alabama.

June 5, 1942.

Thos. S. Lawson, Atty. Gen., and John W. Lapsley and J. Edw. Thornton, Asst. Atty. Gen., for appellant.

Martin, Turner & McWhorter, of Birmingham, for appellee.

LIVINGSTON, Justice.

This action was instituted by appellee, Alabama Power Company, a corporation, by a petition for a declaratory judgment (Title 7, § 156 et seq., Code of 1940) to determine the validity of an assessment of use taxes made against it under the provisions of the Alabama Use Tax Act, Title 51, § 787 et seq., Code of 1940; and to determine whether the appellee is entitled to a refund of the tax paid under protest.

The tangible personal property involved[1] in the assessment consists of boilers, engines, condensers, generators and transformers, and attachments and replacements therefor, purchased by appellee from without the State during the period from January 1, 1940, to March 31, 1940, for use in the generation, manufacture or distribution of electricity in the conduct of its business as a public utility.

Appellee insists that such items constitute machines or machinery used by it in processing or manufacturing tangible personal property, and are therefore exempt under the provisions of paragraph (q) of section 789, Title 51, Code of 1940, which reads as follows:

"§ 789. Exemptions.—The storage, use or other consumption in this state of the following tangible personal property is hereby specifically exempted from the tax imposed by this article: * * * (q) Machines used in mining, quarrying, compounding, processing and manufacturing of tangible personal property; provided that the term 'machines,' as herein used, shall include machinery which is used for mining, quarrying, compounding, processing or manufacturing tangible personal property, and the parts of such machines, attachments and replacements therefor, which are made or manufactured for use on or in the operation of such machines and which are necessary to the operation of such machines and are customarily so used."

By demurrer and answer, appellant presented the issue and contended that the use tax applied to the items involved, and that the exemptions claimed could not be allowed for the reasons, (a) that appellee is not engaged in processing or manufacturing tangible personal property, within the meaning of said Act; (b) the production or generation of electricity does not constitute the processing or manufacturing of tangible personal property within the meaning of said Act; (c) electricity is not tangible personal property within the meaning of said Act, and (d) the transformers involved in said assessment are not machines or parts thereof, or attachments or replacements therefor within the meaning of the machinery exemption clause of said Act.

The lower court entered a decree holding the assessment invalid, and that appel-

56

lee is entitled to a refund of the tax paid under protest, hence this appeal.

The evidence without conflict established the fact that the tangible personal property involved in the assessment was used by appellee during the period covered by the assessment in the generation and distribution of electricity.

Illustrative of the expert testimony offered in behalf of appellee, we quote from the testimony of Dr. K. B. McEachron:

"Electricity can properly be explained by understanding first the construction of the atom, and, to understand that, we have to begin with the molecule. In other words, this desk or the chair in which I am seated is composed of molecules, and those molecules are composed of atoms. The atom is known today to consist of a center portion—call it the kernel, if you want to—which contains positive electrical charges, and it contains an outside shell, or series of shells, containing electrons which is a name given to particles which may be either positive or negative, but in this case negative. In the case of the desk or the chair, the positive and negative charges are substantially equal, which means that, electrically speaking, the desk or chair is neutral; * * * has no charge, one way or another. Of course, this is equally true of copper wire, or any of the ordinary materials that we deal with. Now, if we separate one of these electrons from the atom, one of these negative electrons from the atom, which you will notice is in this outer shell I spoke of, then the atom becomes positively charged, because we have removed a certain amount of the negative charge, which made it balanced or neutral. That negative electron which we removed exhibits certain effects that we are going to talk about. Now, you remember that when we separated the negative from the positive in the atom, we developed a measurable charge between them, because one becomes positively charged and the other is negatively charged. When the electron moves through a conductor or through space, it exhibits the thing which we call a flow of electric current. In other words, electric current, in a conductor, is the flow of electrons, or its equivalent; and when I say 'its equivalent,' I have got to tell you a little bit more. In other words, in a piece of copper wire, which is a conductor, we have packed a great many molecules and, of course, atoms. It is not known today whether or not an electron starts at one end of this conductor and passes all the way through the conductor, this same electron emerging from the other end, or whether the first electron knocks loose a second electron, and that knocks loose a third one, just as a group of billard balls hit by the first ball transmits its motion to the final ball. Actually, it makes no difference, because the result is the same, so far as we are concerned."

This witness further testified that, the generation of electricity is the processing of matter which is constructed from electrons in such a way as to separate the electrons in the atom. In the separated state the electrons in the atom begin to move because of a measurable change between electrons. This movement causes a flow of electrons in a conductor of electricity: such a flow of electrons is electricity. Fuel for a steam driven plant or water for a fuel driven plant is necessary to provide the motive power necessary to separate the electrons in the atom in order to cause a flow of electrons in an electric conductor: that electricity "has mass or weight," and that electricity or its effects may be perceived by the senses. Specifically, he testified that electricity may be tasted: that electricity may be detected by the sense of smell; that electricity may be perceived by touch; and that electricity may be used to produce X-rays and light.

All the expert witnesses agreed that the electricity generated by the transformer is new electricity or electric current generated upon the same principle as in the first instance by the use of the generator; that the electric current coming to a transformer does not pass through to the other side, but the use of the transformer changes the quantity of current on the opposite sides of the transformer. Exhibits were introduced to illustrate the operation of the transformer, as were photographs of a precipitron, which was explained by appellee's witness Wagner. The witness explained that by the use of such apparatus negative electrons might be made to adhere to smoke particles in such manner as to cause the smoke to be attracted by and deposited upon positive plates, thus preventing the smoke from issuing from the chimney-like opening in the precipitron.

Dr. Arthur St. C. Dunstan, Dean of Electrical Engineering Department of the Alabama Polytechnic Institute, a witness for appellant, testified, in effect, that the

generation of electricity was the transforming or conversion of one form of energy "not ordinarily usable by the ordinary customer, into electric energy which can be used by the ordinary customer"; and which energy is distributed to the ultimate consumer. He termed the generation of electricity as the conversion of one form of energy into another. That electricity is already in existence; that the amount of it may not be changed; that we may not take from or add to the amount of it: that electricity when converted into use, is "usable energy," and that the electrons are already in the wire; that by the use of the generator, there is established an electric pressure: that such pressure, acting on the electrons, shoves them along the wire; that whether the same electrons go out at the other end of the wire in which they started may not be determined, but if two go in at one end, two will come out at the other end, although we may not see such electrons; that although no one has ever seen an electron and what it is is not known, it is assumed that there is such a thing as the electron, for the reason that such assumption explains the results of certain experiments; that all electrons are apparently exactly alike, and may not be made larger or smaller.

The question as to whether a public utility engaged in the production or generation, transmission and distribution of electricity is engaged in manufacturing has been presented to the courts from various angles and under different subjects and circumstances, with citation of many authorities. It was considered by this Court in the case of Beggs v. Edison Electric Illuminating Co., 96 Ala. 295, 11 So. 381, 383, 38 Am.St.Rep. 94. The controversy arose over the right of the Edison Electric Illuminating Company and the Merchants Electric Light and Power Company, doing business in Birmingham, to consolidate under the provisions of section 1565, Code of 1886, which declares that "Any two or more mining, quarrying, or manufacturing corporations may unite and consolidate their capital stock, property and business in the manner hereinafter provided." The Court, speaking through Chief Justice Stone, said:

"The direct question involved is whether electric light companies are manufacturing corporations, and as such are authorized by the * * * statute to consolidate. In view of the rapid development of elec-

tricity as a motive power, and considering the many phases in which questions pertaining to this power arise, we do not deem it amiss to decide the question now presented.

"The word 'manufacture' means the making of anything by hand or artifice. Louisville & N. R. Co. v. Fulgham, 91 Ala. 555, 8 So. 803. Mr. Worcester's Dictionary defines 'manufacture' as 'the process of making anything by art, or of reducing materials into a form fit for use by the hand or by machinery.' The definition that the word is given by the Century Dictionary is as follows: 'The production of articles for use from raw or prepared materials by giving these materials new forms, qualities, properties, or combinations, whether by hand labor or by machinery.' According to the above definitions of the word 'manufacture,' we are constrained to consider and declare an electric light company a manufacturing corporation to all intents and purposes. It is no answer to this argument to say that electricity exists in a state in nature, and that a corporation engaged in the electric light business collects and gathers such electricity. This does not fully or exactly express the process by which such corporations are able to make, sell, and deliver something useful and valuable. The electricity that exists in nature is of a very different quality from that produced by means of machinery. The business in which an electric light company is engaged makes it necessary to invest large capital in the plant; and there is purchased and consumed coal and other materials to produce steam in order to furnish the power for the operation of the machinery. Then there is supplied and operated a complicated system of machinery, like that commonly used in manufacturing establishments, such as boilers, engines, dynamos, shaftings, beltings, etc.; and then, by means of wires, cables, and lamps, the mysterious power generated by the machinery used from the materials furnished is transmitted, and lights the streets and private houses. But the electric currents that produce these results cannot be said to be 'the free gifts of nature, gathered from the air or the clouds.' It is the produce of capital and labor, and in this respect cannot be distinguished from ordinary manufacturing operations. The collection, storage, preparation for market, and the transportation of ice, as found in nature, is not manufacturing, but the pro-

duction of ice by artificial means is. People v. Knickerbocker Ice Co., 99 N.Y. 181, 1 N.E. 669. As well say that a gas company, organized under the corporation laws, is not a manufacturing corporation. Both gas and the electricity generated are the result of artifice. Their purpose is the same and their transmission is in a similar manner,—the one by pipes and the other by wires. It has been expressly decided that a gas company is a manufacturing corporation. Nassau Gas Light Co. v. Brooklyn, 89 N.Y. 409.

"When it is attempted to establish the proposition that the gas which lights one room is a manufactured produce, and the electricity which lights another is not, one is obliged to rely more on the definition of terms and the distinctions of scientists than the actual, practical processes and productions by means of which results in all respects, or at least substantially, the same, are produced. When we take into consideration that the electricity now used and applied in the ordinary business of life is essentially the product of skill and labor, we can find no difficulty in reaching the conclusion that a corporation engaged in generating, storing, transmitting, and selling such electricity, * * * is a manufacturing corporation. In reaching this conclusion we are not without precedent. The very point we have in hand was ably considered in the case of People ex rel. Brush Electric Man. Co. v. Wemple, 129 N.Y. 543, 29 N.E. [808] 812 [14 L.R.A. 708]. In that case the court of appeals of New York were unanimous in the opinion that the electric light company was a manufacturing corporation."

The case of People ex rel. Brush Electric, etc., Co. v. Wemple, Comptroller, 129 N.Y. 543, 29 N.E. 808, 811, 14 L.R.A. 708, cited by Chief Justice Stone, in the Beggs case, supra, involved tax exemptions. The legislature of New York provided for the payment of taxes to the state by certain corporations. Manufacturing corporations engaged in manufacturing within the state were exempted from its operation. Under this provision the Brush Company claimed its exemption. The claim depended upon whether or not the Brush Company was a manufacturing corporation. In describing electricity the court said that the application of labor and skill to materials that exist in the natural state gives to them a new quality or characteristic and adapts them to new uses; and the process by which this result is brought about is called "manufacturing," whether the change is accomplished by manual labor or by means of machinery: that there was no difficulty in reaching a conclusion that a corporation engaged in the business of generating, storing, transmitting and selling electricity was what was commonly known at the time of the passage of the original act of 1880 as "a manufacturing corporation." We quote the following excerpt from that opinion: "The material from which all manufactured things originate exists in a natural state; but the manufacturer, by the application to these materials of labor and skill, gives to them a new and useful property. The electricity which is generated and transmitted by the operation of the relator, and which, under its manipulation, illuminates houses and streets, is a very different thing from that mysterious element that is said to pervade nature." The court held that the Brush Company was a manufacturing corporation and entitled to the exemption.

Other cases dealing with the subject of tax exemptions of manufacturers engaged in business similar to that of appellee, and in which a like result was reached, are: In re Consolidated Electric Storage Co., N. J.Ch., 26 A. 983; Southern Electric Light & Power Co. v. City of Philadelphia, 191 Pa. 170, 43 A. 123; Kentucky Electric Co. v. Buechel, 146 Ky. 660, 143 S.W. 58, 38 L. R.A.,N.S., 907, Ann.Cas.1915C, 714; Society for Establishing Useful Manufactures v. City of Paterson, 88 N.J.L. 123, 96 A. 92; Wilentz v. Society for Establishing Useful Manufactures, 118 N.J.L. 20, 190 A. 79; Boston & Maine R. R. Co. v. Town of Billerica, 262 Mass. 439, 160 N.E. 419; Columbia Ry., Gas & Elec. Co. v. Query et al., 134 S.C. 319, 132 S.E. 611; Duke Power Co. v. Bell, 156 S.C. 299, 152 S.E. 865; Chicago, M., St. P. & P. R. Co. v. Custer County, 96 Mont. 566, 32 P.2d 8.

In the case of In re Charles Town Light & Power Co., D.C., 183 F. 160, the court held that the light and power company was a "trading company" within the meaning of the bankruptcy act. But the holding appears to be contrary to that in the cases of In re Hudson River Electric Power Co., D.C., 173 F. 934, and In re Wilkes-Barre Light Co., D.C., 224 F. 248. The latter two cases seem to be based on the right of the company to condemn property and its duty to serve the public, together with the lack of congressional intent to include such

companies within the provisions of the bankruptcy act on account of such rights and duties.

Further persuasive authority on the question of whether appellee is a manufacturer, or is engaged in manufacturing, is found in the following cases dealing with the subject matter as stated: Liability of stockholder of manufacturing company—Vencedor Inv. Co. v. Highland Canal & Power Co., 125 Minn. 20, 145 N.W. 611. Eminent Domain—Lamborn v. Bell, 18 Colo. 346, 32 P. 989, 20 L.R.A. 241; Cascade Town Co. v. Empire Water & Power Co., C.C.Colo., 181 F. 1011; Schwab v. Beam, C.C.Colo., 86 F. 41; McMillan v. Noyes, 75 N.H. 258, 72 A. 759; Zamani v. Otter Tail Power Co., 182 Minn. 355, 234 N.W. 457. Diversion of water for manufacturing purposes —Pacific Gas & Elec. Co. v. United States, 9 Cir., 45 F.2d 708, certiorari denied 283 U.S. 862, 51 S.Ct. 654, 75 L.Ed. 1467. Personal injuries; duty of manufacturing company in relation to its employees—Angola Ry. & Power Co. v. Butz, 52 Ind. App. 420, 98 N.E. 818. Electric co-operative a manufacturing company—State ex rel. Winterfield v. Hardin County Rural Elec. Co-Op. et al., 226 Iowa 896, 285 N.W. 219. Mechanic's lien—Bates Machine Co. v. Trenton & N. B. R. Co., 70 N.J.L. 684, 58 A. 935, 103 Am.St.Rep. 811. A manufacturing corporation under (a) anti-trust statute—State ex rel. Spillman, Atty. Gen., v. Interstate Power Co., 118 Neb. 756, 226 N.W. 427; and (b) reorganization statute —Commonwealth v. Keystone Electric Light, Heat & Power Co., 193 Pa. 245, 44 A. 326. Electricity is a product of manufacture—Hetherington v. Camp Bird Mining, Leasing & Power Co., 70 Colo. 531, 202 P. 1087; Utah Power & Light Co. v. Pfost, 286 U.S. 165, 52 S.Ct. 548, 76 L.Ed. 1038.

We have carefully read and considered the authorities relied on by appellant and cited to the contrary of the conclusion reached in the foregoing cases, among them: Commonwealth v. Northern Electric Light & Power Co., 145 Pa. 105, 22 A. 839, 14 L.R.A. 107; Commonwealth v. Edison Electric Light Co., 145 Pa. 131, 22 A. 841, 27 Am.St.Rep. 683; Commonwealth v. Edison Electric, etc., Power Co., 170 Pa. 231, 32 A. 419; Commonwealth v. Brush Electric Light Co., 145 Pa. 147, 22 A. 844; In re Wilkes-Barre Light Co., D.C., 224 F. 248; 34 Am.Bankr.Rep. 697; In re Hudson River Electric Power Co., D.C.

N.D.N.Y., 173 F. 934, affirmed 2 Cir., 183 F. 701, 33 L.R.A.,N.S., 545; People ex rel. Mercer, County Collector, v. Wyanet Electric Light Co., 306 Ill. 377, 137 N.E. 834; Frederick Electric Light & Power Co. v. City of Frederick, 84 Md. 599, 36 A. 362, 36 L.R.A. 130; People ex rel. v. Roberts, 145 N.Y. 375, 40 N.E. 7.

Some of these cases are distinguishable upon the facts and the questions presented from that here considered. While others may well be said to sustain the view that corporations similar to appellee are not manufacturers or engaged in manufacturing. But we see no necessity for their discussion here. This for the reason that the question as to whether or not an electric company engaged in the generation, production or manufacture of electricity is a manufacturing corporation is definitely decided and fully settled by this Court in the Beggs case, supra, a finding fully supported both by reason and the authorities hereinabove set forth. And we hold that appellee is a manufacturing corporation.

Is electricity tangible? According to Webster "tangible" means "capable of being touched, also perceptible to the touch; palpable."

It is to be noted that electricity has been referred to in the decisions as a commodity, —Commonwealth v. Northern Electric Light & Power Co., 145 Pa. 105, 117, 22 A. 839, 840, 14 L.R.A. 107; San Antonio Gas Co. v. State, 22 Tex.Civ.App. 118, 122, 54 S. W. 289, 291, 292; Cascade Town Co. v. Empire Water & Power Co., C.C., 181 F. 1011, 1016; Seaton Mt. Electric Light, Heat & Power Co. et al. v. Idaho Springs Inv. Co. et al., 49 Colo. 122, 131, 111 P. 834-837, 33 L.R.A.,N.S., 1078; State ex rel. Spillman v. Interstate Power Co., 118 Neb. 756, 771, 226 N.W. 427, 433; Sixty-Seven South Munn, Inc., v. Board of Public Utility Com'rs. of New Jersey, 106 N.J. L. 45, 46, 147 A. 735, 736, affirmed 107 N. J.L. 386, 152 A. 920: as substance,—Fickeisen v. Wheeling Electrical Co., 67 W.Va. 335, 337, 67 S.E. 788, 789, 27 L.R.A.,N.S., 893; Grants Pass Trust Co. v. Enterprise Mining Co., 58 Or. 174, 176, 177, 113 P. 859, 34 L.R.A.,N.S., 395; and as a commercial product,—Society for Establishing Useful Manufactures v. City of Paterson, 88 N.J.L. 123, 126, 96 A. 92, 93; as supplies,—Grants Pass Trust Co. v. Enterprise Mining Co., supra; and as property, —Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688.

In Title 51, section 789, Code of 1940, containing the list of exemptions the following words are used: "The storage, use or other consumption in this state of the following tangible personal property is hereby specifically exempted from the tax imposed by this article. * * * (p) Transportation, gas, water or electricity, of the kinds and natures, the rates and charges for which, when sold by public utilities, are customarily fixed and determined by the public service commission of Alabama or like regulatory bodies * * *."

The conclusion is inescapable that the foregoing constitutes an express legislative characterization of electricity as tangible personal property within the meaning of the Use Tax Act.

We might well rest upon the legislative declaration, but, in addition, the proof and scientific facts, sustain the claim of tangibility. The proof shows that electricity consists of negative electrons. Electrons have mass or weight. Electricity can be tasted. It can be detected by the sense of smell. It can be perceived by touch. A sufficient charge will tear a hole in the body as it enters and as it leaves. Electrons may be fired against a target as in the case of the X-ray machine. The purpose of the generator is to separate the positive from the negative electrons within the generator itself, and that constitutes a driving force which pushes the electrons through the circuit, and the motion of these electrons through the circuit is electric current. The flow of electrons is substantially the same type as the flow of water.

In the neon signs the electrons strike the molecules of gas contained in the tube, whereupon the molecules become excited and vibrations are given off, which correspond to light. In the precipitron negative electrons are discharged from a high voltage wire and spray the area in the immediate vicinity. As smoke particles come in contact wtih these negatively charged electrons the smoke particles are impelled or forced against the positive plates on which it accumulates. Many other examples of the use and performance of electrons support the view of tangibility.

We conclude, therefore, that appellee is engaged in manufacturing tangible personal property.

The proof is to the effect that the office of the transformer is to change the voltage of electricity to suit the use of the customer. Under the influence of incoming current the transformer generates a separate new current. The movements of electrons in the separate circuits of a transformer convert electricity into marketable form or change electricity into a marketable form. The purpose of a transformer is to put electricity in a form which is usable. Energy is transformed in order to make it marketable to domestic users.

The definition of the word "process", as given by Webster's New International Dictionary, Second Edition contains the following:

"A series of actions, motions, or operations definitely conducing to an end, whether voluntary or involuntary; progressive act or transaction; continuous operation or treatment; a method of operation or treatment, esp. in manufacture; * * *

"To subject to some special process or treatment. * * * b To subject (esp. raw material) to a process of manufacture, development, preparation for the market, etc; to convert into marketable form, as livestock by slaughtering, grain by milling, cotton by spinning, milk by pasteurizing, fruits and vegetables by sorting and repacking; * * * c To make usable, marketable, or the like, as waste matter or an inferior, defective, decomposed, substance or product, by a process, often a chemical process; * * * d To produce or copy by photo-mechanical methods; to develop, fix, wash and dry, or otherwise treat (an exposed film or plate)".

We do not disagree with the authorities cited by appellant on the question as to what constitutes "processing," but they cannot be regarded as very helpful in determining the question here presented, and, in our opinion, the transformer is a processing machine within the meaning of the Use Tax Act.

The views here expressed are in accord with the judgment of the trial court, and the same is affirmed.

Affirmed.

GARDNER, C. J., BOULDIN, and FOSTER, JJ., concur.