73 So.2d 731

### SOUTHERN NATURAL GAS CO.

v.

### STATE.

3 Div. 640.

Supreme Court of Alabama.

Nov. 19, 1953.

Rehearing Granted June 30, 1954.

Cabaniss & Johnston and Meade Whitaker, Birmingham, for appellant.

Si Garrett, Atty. Gen., and M. Roland Nachman, Jr., Asst. Atty. Gen., for appellee.

GOODWYN, Justice.

The principal questions for decision are whether the appellant Gas Company is liable for use tax on three categories of property, viz.: gas compressors, electric generators, and regulators. The company's position is that these are machines or machinery used in "processing" tangible personal property and, as such, are exempt from the use tax by virtue of Sect. 789(p), Tit. 51, Code 1940, as amended. This section provides for exemption from use tax of the following:

"Machines used in mining, quarrying, compounding, processing, and manufacturing of tangible personal property; provided that the term 'machines,' as herein used, shall include machinery which is used for mining, quarrying, compounding, processing, or manufacturing tangible personal property, and the parts of such machines, attachments and replacements therefor, which are made or manufactured for use on or in the operation of such machines and which are necessary to the operation of such machines and are customarily so used."

The trial court exempted the regulators and held the compressors and generators to be subject to the tax. The company has taken this appeal, assigning as error the action of the court holding the compressors and generators assessable. The state has cross-assigned error, taking the point that the court erred in exempting regulators.

The company also assigns as error the trial court's action in sustaining demurrers to that aspect of the bill seeking as a credit or set-off against that portion of the tax found to be due, certain sums alleged to have been erroneously paid to the state by the company for use tax during the assessment periods here involved; also, that the court erred in taxing all the costs against the company.

Before proceeding further, we can dispose of the state's contention with re-

spect to regulators by simply referring to our recent case of State v. Alabama Gas Corp., 258 Ala. 356, 62 So.2d 454. We there held regulators to be exempt, and see no need for further discussion on that point now.

Testimony was given on behalf of the company by R. H. Burdick, its consulting engineer, and on behalf of the state by Professor John A. Needy, of Alabama Polytechnic Institute. So far as pertinent to a decision, there is no marked dissimilarity in their testimony. The following facts appear to be adequately established:

The company owns and operates a natural gas transmission system extending from Texas to Georgia. Approximately 94% of its gas is purchased from producers at the wellheads. The other gas comes from wells owned by the company. All of the gas comes from gas fields located in Texas, Louisiana, and Mississippi. The company's principal function is to furnish the link between the producing gas well and the final distributing company. Its transmission system consists of small diameter field lines from the several gas fields to dehydration plants, larger diameter long distance transmission lines, and, finally, smaller diameter delivery lines to points of delivery to the final distributing companies which serve the public directly. In some instances, the company sells gas in wholesale quantities direct to large industrial consumers. All of the dehydration plants are located near the gas fields outside the State of Alabama. In Alabama, the company maintains pipe lines along which, at strategic intervals, are located compressor stations. There are four of these stations. One is located at each of the following places: Reform, Tarrant City, DeArmanville, and McConnell's Junction about 20 miles north of Tuscaloosa. The compressors and electric generators located at these stations are the subjects of this suit. The generators are used as stand-by equipment in case of an electric power failure, to be used for furnishing electricity, which is essential in the operation of the compressors. If the use of the compressors is held to be taxable, then, of course, the tax is likewise applicable to the use of the generators.

As the gas comes from the wells, it contains both moisture and distillate which must be substantially removed before the gas becomes commercially usable. The distillate is a low-grade petroleum substance similar to gasoline. If not substantially removed, the distillate will deposit in, and clog up, the consumer appliances, and may also form a gas hydrate in the pipe lines, meters, and regulators, which might have the effect of blocking them and preventing delivery of the gas. Removal of most of the distillate and moisture is accomplished when the gas goes through the dehydration plants. Distillate is there recovered in commercially salable quantities as a by-product. About 70 per cent of the gas which the company sells is processed through the company's own dehydration plants. The rest is processed through dehydration plants of one of the producers. After the gas leaves a dehydration plant, it can be used for commercial purposes without further treatment.

The compressor stations are located so that they may impart energy to the gas to induce its continued movement to delivery points or to the next compressor station. With respect to these compressor stations, Mr. Burdick testified as follows:

"I would say that compressors are absolutely essential to the distribution to market, as it would be uneconomical not to use them. In other words, it would be uneconomical to use pipe lines of such diameter and volume that the gas could be handled without the use of compressors."

The following are questions and answers on cross-examination of Mr. Burdick:

"Q. Does Southern sell any gas in Alabama before the gas reaches its first compressor station? A. Yes, it does at Reform, Alabama.

"Q. Gas is sold there before it goes through the compressor? A. Before it goes through the compressors.

"Q. Then that would indicate, would it not, that the compressor sta-

tion adds little or nothing to the marketing of the gas? A. That is correct as far as Reform station is concerned, but a previous station at Louisville, Mississippi has pumped the gas to Reform."

He further testified that the changes in the gas made by the compressors are essentially the following: (1) A change occurs in the pressure at which the gas is moving; (2) sometimes liquid comes out of the gases; (3) for a very short distance the temperature or B.T.U. content of the gas is changed; and further, that nothing else happens to the gas in the compressors. The purpose of the gas compressor, and what occurs when gas passes through it, is thus stated in appellant's brief:

"The primary function of the gas compressor is to impart energy to the gas in order to induce its movement through the transmission system. Compressor stations are located at strategic points along the system so that the pressure of the gas does not fall below 200 to 250 pounds. The gas compressor is designed to raise gas pressure up to the maximum operating pressure of 500 pounds. It is undisputed that without compression of the gas at the compressor station the gas would not reach markets in Alabama in salable quantities. * * *

"Although increase in the pressure of the gas is the primary function of the compressor, nevertheless, in this process additional quantities of moisture and distillate are removed from the gas at the compressor station as a necessary step in the operation.

"The increase in gas pressure as a result of the action of the gas compressor results in an increase in the B.T.U. content of the gas for a given volume. The number of molecules per volume of gas is increased, hence the molecular structure changed. The compressor also increases substantially the temperature of the gas. Then for most efficient operation the gas is cooled immediately after compression to approximately ground temperature in order to provide maximum pipeline capacity, and to cause the deposit or removal of distillate and moisture still in the gas at a point where it can be easily disposed of and controlled, preventing deposit further along in the pipeline which might interfere with operation or be again absorbed by the gas.

"Further, the removal of distillate at the compressor station produces a measurable change in the chemical composition of the natural gas. The testimony is to the effect that so-called natural gas is a combination of certain elements such as methane, nitrogen, carbon dioxide, ethane, propane, butane and small quantities of other hydrocarbons. The deposition or removal of distillate takes out of the gas by absorption certain quantities of these elements but in varying amounts so that the proportion of these natural gas constituents in relation to each other is changed. In other words, after the deposition of distillate at the compressor station, the natural gas is composed of the same basic elements but in a slightly different relationship to each other.

"This process to which natural gas is subjected at the compressor station, then, serves to increase the pressure of the gas, which is accompanied by an increase in B.T.U. content and temperature. The gas is additionally refined by the removal of distillate and moisture, which is a direct benefit to the consumer. And there is an actual change in the chemical analysis of the gas. The compressor stations are essential units in appellant's gas system, integral lengths in the process of providing natural gas to the consuming public."

No contention is made that the compressors are used in "compounding" or "manufacturing" tangible personal property. Nor is it disputed that natural gas is "tangible personal property." We are con-

cerned only with determining whether compressors are used in "processing" the gas.

We have had occasion to quote approvingly in several cases, State v. Advertiser Co., 257 Ala. 423, 59 So.2d 576, 579; Curry v. Alabama Power Co., 243 Ala. 53, 60, 8 So.2d 521, the following definition of the word "process" as given by Webster's New International Dictionary, 2nd Ed.:

"A series of actions, motions, or operations definitely conducing to an end, whether voluntary or involuntary; progressive act or transaction; continuous operation or treatment; a method of operation or treatment, esp. in manufacture; * * *

"To subject to some special process or treatment. * * * b To subject (esp. raw material) to a process of manufacture, development, preparation for the market, etc; to convert into marketable form, as livestock by slaughtering, grain by milling, cotton by spinning, milk by pasteurizing, fruits and vegetables by sorting and repacking; * * * c To make usable, marketable, or the like, as waste matter or an inferior, defective, decomposed, substance or product, by a process, often a chemical process; * * * d To produce or copy by photo-mechanical methods; to develop, fix, wash and dry, or otherwise treat (an exposed film or plate)."

■ Under this definition, it is apparent that the word "process" is synonymous with the expressions "preparation for market" and "to convert into marketable form." It is uncontroverted that the gas is "prepared for market" and in "marketable form," that is, in commercially usable form, before it reaches any of the compressor stations in Alabama. As we see it, the fact that some moisture and distillate are extracted from the gas when subjected to pressure is but an incident of that operation and cannot serve to make of it a step in "processing" the gas, within the meaning of that term as used in Sect. 789(p), supra. Admittedly, the gas, insofar as its substance is concerned, is ready for use by the consumer as soon as it leaves the dehydration plant. What, then, is the particular need or purpose of the compressors? True, they are essential in getting the gas to the company's customers. But are they not, by analogy, in the same category as all other machines used in transporting tangible personal property in marketable form? The distribution of gas may be compared to that of unpackaged commodities loaded upon trucks at the factory and delivered to customers. The compressors may be compared to the engines in the trucks—they both provide motive power. But, in so providing, neither operates on the product being distributed so as to make it marketable. They are simply methods of transportation, employed because they are the most practical or the most economical means of making delivery. For us to hold that the compressors are used in "processing" the gas would require, we think, an unwarranted expansion of the ordinarily understood definition of that term. It seems to us, aside from any other consideration, the fact that gas is delivered in marketable form for use at Reform, Alabama, without first going through a compressor station in Alabama, compels a conclusion that the compressors are not used in "processing" but, instead, "in the transportation system" of the company, as found by the trial court. And we so hold. As a necessary consequence, the electric generators are likewise held not to be used in the "processing" of the gas.

■ Stated simply, the situation with respect to the right of set-off seems to be this: The final assessment was made by the Department of Revenue on February 21, 1951, for the period of April 1, 1947, to December 31, 1949. The assessment was based on purchases by the company, during said period, of compressors, electric generators, and regulators, and parts, attachments and replacements therefor. Up to the time of making the assessment no question was raised as to allowance of credit for any excessive payments of use taxes allegedly made during the assessment period. Such question was first raised by amendment to the taxpayer's bill in the circuit court. The insistence is that the de-

partment of revenue should have made such allowance under Sect. 802, Tit. 51, Code 1940. However, it seems to us that the plain wording of Sect. 802 is a complete answer to this contention. The field of operation of this section is limited to a determination *"by the department* that an amount of tax or an amount required to be collected has been paid to the state in excess of the amount properly due * * *." [Emphasis supplied.] This section merely provides machinery whereby the department, if the department determines that an excessive amount of tax has been paid, may credit the taxpayer with such overpayment against taxes presently due, and may refund any remaining balance. It simply gives the department certain authority in this regard, and the exercise of such authority is contingent upon a determination by the department, and not by the taxpayer or an appellate court, as to whether or not there has actually been an excessive payment of tax in the past.

■ Clearly, Section 802 does not enable taxpayers, who have voluntarily paid taxes in the past, and who have not petitioned, pursuant to Section 913, Tit. 51, Code 1940, for refund of taxes mistakenly paid, to escape the consequences of their failure and to question such taxes at any time in the future.

The legislative scheme is apparent. Taxpayers may appeal from assessment under Section 140, Tit. 51, Code 1940. If taxes have been mistakenly paid without protest, Section 913 provides a remedy—but this remedy must be instituted within two years (now three years) from the date of payment.

Since there is no question that the payments involved were voluntarily made; since the payments are not part of the assessment appealed from; since no petition for refund has been filed pursuant to Section 913; and since the department has made no determination that the voluntary payments were excessive, Section 802 has no field of operation in this case, and the ruling of the lower court on the demurrers to the amended complaint in this respect were correct.

■ We come now to consider the question of costs. The trial court assessed the costs against the taxpayer, appellant here. Insistence is made that a part of the costs should have been assessed against the state, since the taxpayer there prevailed with respect to the item of regulators. No question is presented as to the authority of the trial court to apportion the costs, Equity Rule 112, Code 1940, Tit. 7, Appendix; Code 1940, Tit. 7, Sect. 292, or as to varying the taxation of costs on appeal here, as the justice of the case may require, Plateau Community Ass'n v. Green, 243 Ala. 531, 532, 10 So.2d 860; Manning v. Carter, 201 Ala. 218, 77 So. 744.

Equity Rule 112, in pertinent part, is as follows:

"Costs will be imposed by the court or judge having jurisdiction at such times during the litigation as he deems proper, subject to correction for improper exercise of his discretion, and may be apportioned by him between the parties; * * *."

In referring to this rule, this court, in Dozier v. Payne, 244 Ala. 476, 477, 14 So.2d 376, 377, had this to say:

"This rule needs no elaboration. It follows the long established rule in equity vesting in the chancellor a discretion in the taxation of costs; but, says the rule, 'subject to correction for improper exercise of his discretion.' An 'improper' exercise of discretion appears when the record, after indulging all fair intendments in favor of the ruling, discloses the taxation of costs was unjust and unfair. Otherwise the action of the trial court should not be disturbed.

"The general rule at law, usually followed in equity, is to award the costs in favor of and not against the successful party in the suit. As a rule this is just. Apportionment of costs may be just in many instances dependent upon the particular case. * * *"

In Thompson v. Bryant, 251 Ala. 566, 569, 38 So.2d 590, 593, we stated as follows:

"In equity the matter of costs rests largely in the discretion of the chancellor."

The question, then, is whether the court abused its discretion. We cannot say that it did. No doubt the court took into consideration the fact that the use tax assessment of $771.70 on regulators represented a relatively small part of the total assessment of $27,967.31.

The decree is due to be affirmed. It is so ordered.

Affirmed.

All the Justices concur.

On Rehearing.

GOODWYN, Justice.

The Gas Company now insists that even though it be held that the gas compressors are subject to the use tax, the opinion should be modified so as to exempt the electric generators. The position taken is as follows: That the generating equipment is of the type, and designed for the same purpose, as that used by any electric power company for generating electricity for sale; that if so used by such company, it would unquestionably be exempt from use tax under the doctrine of Curry v. Alabama Power Company, 243 Ala. 53, 8 So.2d 521; and that, under the decision in State v. Calumet & Hecla Consol. Copper Co., 259 Ala. 225, 66 So.2d 726, 729, the exemption is not made dependent on the fact of *sale* of the electricity but applies even though all of the electricity is used or consumed by the owner in his own business.

On original consideration, we treated the generators as though they were integral, inseparable and essential parts of the gas compressors; and proceeded on the theory that their tax status depended on that of the gas compressors. Such was the position we understood to be taken by counsel. In the light of the Calumet case, supra, we are constrained to hold that the electric generators are in a category separate and distinct from the gas compressors, and are exempt as machines used in manufacturing tangible personal property, viz: electricity. Curry v. Alabama Power Company, supra. As we see it, the question presented is: Does the fact that an electric generator used by the owner to manufacture electricity to be used exclusively in the owner's business for a purpose other than in compounding, processing or manufacturing of tangible personal property, serve to deny use tax exemption to such generator? In other words, to be exempt, must the electricity be used in the compounding, processing or manufacturing of tangible personal property? And is the use to be made of the tangible personal property manufactured by a machine a criterion for determining the exempt status of the machine? Since the Calumet case holds, in effect, that it is not necessary for a machine to manufacture tangible personal property *for sale* in order to be exempt, we see no rational basis for holding that the generators in this case, which are manufacturing tangible personal property, not for sale, should not also be held to be exempt. Counsel for the state suggest that the case at hand and the Calumet case may be differentiated, in that in the Calumet case the machines sought to be taxed were manufacturing tangible personal property which, in turn, was used in manufacturing tangible personal property *for sale*, while in the instant case the machines sought to be taxed manufacture tangible personal property—electricity—which is not used in connection with any of the exempt categories, i. e., compounding, processing or manufacturing tangible personal property. True, the situation in the two cases is different in the respect indicated, but we find nothing in the Calumet case which would support a holding that a machine for manufacturing tangible personal property is taxable unless the property manufactured is, in turn, used in compounding, processing or manufacturing tangible personal property either for use by the owner or for sale, or is itself manufactured for sale. The effect of the Calumet case is that, in order for a machine used in manufacturing tangible personal

property to be exempt, it is not required that such property itself be manufactured for sale or that it be used in compounding, processing or manufacturing tangible personal property either for use by the owner or for sale. So long as a machine is used for manufacturing tangible personal property, it is granted exemption by the statute, Code 1940, Tit. 51, Sect. 789(p), as amended regardless of the use made of the property manufactured. Such is the import of the Calumet case. By this we do not wish to be understood as holding that every device which might be said to have for its purpose the compounding, processing or manufacturing of tangible personal property is necessarily exempt. There may be circumstances affecting its exempt status, such as where a device becomes an integral and inseparable part of a non-exempt machine so as to make it indistinguishable as a separate unit. But that question is not before us. Here, we think it is sufficiently shown that the generators, as stand-by power units, are separate and distinct from the non-exempt compressors.

As stated in the opinion in the Calumet case:

"The fact remains that the appellant [state] is asking the courts to supply words not found in the statute itself and which could have been inserted in the act by the legislature if it had intended so to do."

If the legislature had intended to restrict the exemption to machines manufacturing tangible personal property for sale, or which, in turn, is used in compounding, processing or manufacturing tangible personal property either for use by the owner or for sale, it would have been a simple matter to have so provided. It is not our prerogative to question the wisdom of the exemptions. That is a matter of policy which rests exclusively with the legislature.

The original opinion is modified and the judgment of the trial court reversed in the respects indicated. Judgment will be rendered here exempting the electric generators, and parts, attachments and replacements therefor, from the use tax assessment.

Application for rehearing is granted. Opinion and judgment modified. Opinion extended.

Reversed in part, affirmed in part and rendered.

LAWSON, SIMPSON and CLAYTON, JJ., concur.

LIVINGSTON, C. J., and STAKELY and MERRILL, JJ. (dissenting).

Section 789(p) of Title 51, as reenacted, without change, in the Act of July 12, 1949, Acts 1949, page 300, pocket part Code, exempts from the use tax "machines used in * * * compounding, processing and manufacturing of tangible personal property; provided that the term 'machines,' as herein used, shall include machinery which is used for * * * compounding, processing or manufacturing tangible personal property, and the parts of such machines, attachments and replacements therefor, which are made or manufactured for use on or in the operation of such machines and which are necessary to the operation of such machines and are customarily so used". That definition of a "machine" exempted from the tax should be used to determine whether the machine should be taxed. It defines the "machine" applicable to the use tax. If such a machine produces, etc., tangible personal property, it is not subject to the use tax (not now considering mining or quarrying), if it does not, it is subject to the use tax.

The tax is levied by section 788, Title 51, Code, on the storage, use or other consumption in this state of tangible personal property, unless it is exempt by section 789, supra. We applied the statute in State v. Wilputte Coke Oven Corp., 251 Ala. 271, 37 So.2d 197, so that when a machine is set up, intended for and capable of producing tangible personal property and therefore exempt from the use tax, the use of its fabricated parts purchased in another state is not their use, storage or consumption, so as to make them subject to the use tax. That was before it was reenacted. It

means, therefore, that by its reenactment. So that if the compressor were exempt that would exempt its parts and attachments without regard to the status of those parts in relation to the tax.

The opposite must also be true. That if the compressor is taxable because not exempt, all its parts are likewise taxable. There can be no controversy as to those statements.

The ultimate result here sought, therefore, depends upon whether the generators are a part of or attachment to the compressor. That makes it necessary to determine what is meant by the compressor. The law is dealing with the operation of a machine in levying a use tax. The one machine which actually compresses the gas cannot operate to that end for the purpose for which it is designed without the use of electricity. Electricity is otherwise available under normal conditions, and is obtained from the Alabama Power Company. The generator is largely a stand-by. It is not used when Alabama Power electricity is available. But it is necessary to the conduct of the business that this source of "fire" also be available. The compressing outfit is incomplete without it. It is not used for any purpose except to constitute a part of the machine or "machinery" used in conducting the compressing operation. The statute uses the word "machinery" as having a broader meaning than simply a "machine". The generator is a necessary feature of that operation. It is therefore a "part" of and an "attachment" to the machinery which serves the one purpose. As a stand-by it is distinct from its production of electricity as tangible personal property, and it is seldom so used.

This theory does not conflict with State v. Calumet & Hecla Consol. Copper Co., 259 Ala. 225, 66 So.2d 726, to the effect that the exemption by reason of producing tangible personal property is not controlled by the disposition of such property. Its standby service is the main purpose of its presence. Regardless of everything else, the exemption should not apply when its chief purpose is that of a stand-by, and not the actual production of property. It is there-

fore consistent with the Calumet case to hold that if the generators are used in producing tangible personal property, its use to that effect is so small that it should not be so classified. See page 730 of 66 So.2d, note 5 of Calumet case.