Franco Distributing Company and Franco Novelty Company (Franco) appealed in the Montgomery County Circuit Court for a refund of sales tax that Franco had paid according to an assessment by the State Department of Revenue (Department) for the period from May 1, 1986, through April 30, 1989. The Department's assessment was levied pursuant to subsection (1) of § 40-23-2, Ala. Code 1975, which provides for a tax at the rate of four percent on the gross proceeds of retail sales of "any tangible *Page 145 
personal property whatsoever." Franco subsequently claimed, however, that its sale of video arcade game machines, pinball machines, juke boxes, and vending machines qualified for the reduced "machine" sales tax rate of one and one-half percent, as provided for under subsection (3) of this statute.
Section 40-23-2(3) calls for the levying of a sales tax as follows:
 "Upon every person, firm or corporation engaged or continuing within this state in the business of selling at retail machines used in mining, quarrying, compounding, processing and manufacturing of tangible personal property an amount equal to one and one-half percent of the gross proceeds of the sale of such machines; provided, that the term 'machines' as herein used, shall include machinery which is used for mining, quarrying, compounding, processing or manufacturing tangible personal property, and the parts of such machines, attachments and replacements therefor, which are made or manufactured for use on or in the operation of such machines and which are necessary to the operation of such machines and are customarily so used."
On the basis of § 40-23-2(3) the trial court held that the machines sold by Franco "processed" electricity and were therefore entitled to the favorable one and one-half percent sales tax rate. The Department appeals from the trial court's judgment. We reverse and remand.
The Department concedes that electricity is "tangible personal property" within the meaning of § 40-23-2(3). See,e.g., State v. Television Corp., 271 Ala. 692, 127 So.2d 603
(1961); Curry v. Alabama Power Co., 243 Ala. 53, 8 So.2d 521
(1942). However, the Department contends that the trial court erred in holding that Franco's various machines are used in "processing" electricity within the meaning of the statute.
At trial Franco offered testimony as to how the machines that it sold operate. Franco's expert witness explained in detail the electronic workings of the various components of a video game machine. Electricity is received in the form of alternating current from an outside power source, usually through a wall outlet. Upon entering the machine, the electricity passes through a filter and is converted into direct current. The electricity then flows through a transformer, which reduces the voltage, then travels to a switching regulator that channels the electricity to a logic board. From the logic board, the electricity is channeled to various components of the machine, causing parts to move and images and colors to appear and move on a video screen. Sound is created by the flow of electrical current (defined as "electrons moving from one location to another") and impulses through an amplifier in the logic board. The machine also contains a power capacitor, traps, a video sequencer, character generators, converters, and resistors. The pinball machines, juke boxes, and vending machines function electronically in substantially the same manner as the video game machines.
The trial court found that various of the above-mentioned components — specifically transformers, amplifiers, voltage regulators, power capacitors, video sequencers, traps, filters, character generators, and converters — "are accepted, as a general rule, as being machines that do process [electricity]."
When ascertaining the meaning of the term "processing" as used in § 40-23-2(3) and its predecessor, our supreme court stated the following:
 "We have had occasion to quote approvingly in several cases, State v. Advertiser Co., 257 Ala. 423, [428], 59 So.2d 576, 579 [(1952)]; Curry v. Alabama Power Co., 243 Ala. 53, 60, 8 So.2d 521, [526-27] [(1942)], the following definition of the word 'process' as given by Webster's New International Dictionary, 2nd Ed.:
 " 'A series of actions, motions, or operations definitely conducing to an end, whether voluntary or involuntary; progressive act or transaction; continuous operation or treatment; a method of operation or treatment, esp. in manufacture; . . . *Page 146 
 " 'To subject to some special process or treatment. . . . To subject (esp. raw material) to a process of manufacture, development, preparation for the market, etc; to convert into marketable form, as livestock by slaughtering, grain by milling, cotton by spinning, milk by pasteurizing, fruits and vegetables by sorting and repacking. . . . To make usable, marketable, or the like, as waste matter or an inferior, defective, decomposed substance or product, by a process, often a chemical process. . . . To produce or copy by photo-mechanical methods; to develop, fix, wash and dry, or otherwise treat (an exposed film or plate).' "
Southern Natural Gas Co. v. State, 261 Ala. 222, 227,73 So.2d 731, 735 (1954). Under this definition, it is apparent that the word "process" is synonymous with the expressions "preparation for market" and "to convert into marketable form." Id.
We find that the electricity used by Franco's machines is "prepared for market" and in a marketable, commercially usable form before entering the machines via the electric cord and plug in the wall outlet. The fact that the direction of the flow of electrons may be altered upon entering the machines, or that the volume of the flow of the electric current may be reduced or increased by the different components, does not suffice, under the present facts, to make of it a step in "processing" electricity as that term is used in § 40-23-2(3). As is the case with innumerable other products — including virtually every electrical household appliance, from television sets to toasters — the electricity used by Franco's machines is an energy source. As the Department contends in its brief, the machines do not operate on the electricity so as to make it marketable; rather, the machines are the "market" that the electricity is meant to reach.
The trial court based its holding partly on the finding that the Department has promulgated regulations, specifically Department of Revenue Regulations § 810-6-2-.98 and §810-6-2-.101, expressly declaring that transformers, amplifiers, voltage regulators, and power capacitors "process" electricity under the meaning of the relevant statute. The cited regulations were promulgated to reflect various judicial holdings in cases where the courts of this state have been called upon to interpret § 40-23-2(3) and its predecessor. While some language in the regulations might at first appear to sustain the trial court's broad interpretation, we adjudge that the case law that forms the basis of the regulations is consonant with the interpretation that we have found here.
The Department's regulations are based on cases with facts inapposite to those in the instant case. See Television Corp.,271 Ala. 692, 127 So.2d 603; Curry, 243 Ala. 53, 8 So.2d 521;Mountain Brook Cablevision, Inc. v. State of Alabama, CV-82-1470-TH (Cir.Ct. Montgomery County Feb. 25, 1983);Cablevision Co., v. State of Alabama, CV-82-1470-TH (Cir.Ct. Montgomery County Feb. 25, 1983). The taxpayers in those cases were all involved in activities consistent with the definition of "processing" that is found in Southern Natural Gas Co.; that is, they were preparing tangible personal property for market or converting tangible personal property into marketable form. None of these cases involved a claim that the simple use of raw electrical current obtained through a wall outlet "processes" electricity within the meaning of § 40-23-2(3).
Nor do any of the cited Departmental regulations suggest that electricity is "processed" when it is used in such a manner. Moreover, the Department has never promulgated a regulation declaring that machines that use electricity obtained through an ordinary wall outlet "process" electricity.
In view of the purported uncertainty as to the meaning of § 40-23-2(3) and the related regulations, we deem it important to point out here the well-settled legal principle that when a literal interpretation would defeat the purposes of a statute, that interpretation should not be adopted if any other reasonable construction can be given to it. Tennessee Coal,Iron R. Co. v. State, 235 Ala. 152, 177 So. 905 (1937). Likewise, a statute is to be *Page 147 
given practical construction, and any general terms used therein are to be so limited in their application as not to lead to an absurd consequence. Trailway Oil Co. v. City ofMobile, 271 Ala. 218, 122 So.2d 757 (1960).
We note here that construction of a statute is a legal question. Phenix City Bd. of Education v. Teague, 515 So.2d 971
(Ala.Civ.App. 1987); Galloway v. State, 371 So.2d 48
(Ala.Civ.App. 1979). Thus, the trial court's finding as to this matter will be reviewed by this court without any presumption of correctness.
We find it unreasonable to believe that the legislature in enacting § 40-23-2(3) intended that video game machines, pinball machines, juke boxes, and vending machines should receive the reduced sales tax rate provided for under the statute on the basis that these machines "process" electricity. To find that the legislature intended such a result would be to find that the legislature actually intended that virtually all
electrical appliances would receive the favorable rate because they also contain transformers, capacitors, voltage regulators, traps, filters, and other components commonly found in electrical products. We find that the legislature did not intend such a result.
Likewise, we find that because Franco's machines did not convert tangible personal property into marketable form, the trial court erred by holding that the machines "processed" electricity and were entitled to the favorable one and-one-half percent sales tax rate. Accordingly, the judgment of the trial court is reversed and the cause remanded with instructions for the trial court to enter an order consistent with this opinion.
We pretermit as unnecessary a discussion of the issue raised by Franco on cross-appeal.
REVERSED AND REMANDED WITH INSTRUCTIONS.
ROBERTSON, P.J., and THIGPEN, J., concur.